467 A.2d 605

COMMONWEALTH of Pennsylvania

v.

Carmen P. MUSOLINO, Appellant.

Superior Court of Pennsylvania.

Argued May 19, 1982.

Filed Oct. 21, 1983.

428

John L. Doherty, Pittsburgh, for appellant.

Jay Paul Kahle, Smethport, for Commonwealth, appellee.

Before ROWLEY, MONTEMURO and VAN der VOORT, JJ.

MONTEMURO, Judge:

The appellant, Carmen P. Musolino, was convicted of second degree murder by a jury in a trial conducted before the Honorable William F. Potter, Court of Common Pleas, McKean County. Motions for new trial and in arrest of judgment were denied and the appellant was sentenced to life imprisonment. This is an appeal from the Judgment of Sentence.[1]

The salient facts are as follows: The appellant was arrested on May 28, 1980, for the murder of one Jean V. Engel. The homicide occurred on the evening of May 21, 1980 at the home of the victim in Bradford, Pennsylvania. The appellant was arrested in Bradford Hospital where he was undergoing treatment for injuries sustained from a suicide attempt. Nearly four hours after the appellant's admission to the hospital, the District Attorney obtained from him a detailed confession of the homicide which was transcribed and admitted into evidence at trial.

Before his confession, and in response to a thorough explanation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the appellant

---

1. The Honorable William F. Potter was not retained in the election of November 3, 1981 and, consequently, no opinion was issued pursuant to Pa.R.A.P. 1925.

requested that he talk to Father Henry Andrae, a priest with whom the appellant was familiar. Upon Father Andrae's arrival, the appellant was permitted to confer with him in private. After this conference, the *Miranda* rights were again explained to the appellant.

On October 22, 1980, a suppression hearing was conducted before the Honorable William F. Potter. During this hearing it was made clear that Father Andrae, if called as a witness, would invoke the priest-penitent privilege as set forth under section 5943 of the Judicial Code.[2] The District Attorney proceeded to question Father Andrae about an alleged telephone call made to him by the appellant regarding both the homicide and the appellant's subsequent attempted suicide. Father Andrae, as predicted, refused to answer these questions, and asserted the privilege.

During the trial on October 27, 1980, the District Attorney called Father Andrae to the witness stand. Appellant's defense counsel objected to having the priest questioned in front of the jury. Upon this objection, a sidebar conference was held wherein defense counsel indicated to the court that at the time of the suppression hearing, the District Attorney was made aware that Father Andrae would invoke the priest-penitent privilege.[3] The trial judge ruled that there existed no privilege since any information that the priest was obligated to withhold was disclosed by the appellant in his confession. The District Attorney then proceeded to ask Father Andrae a series of questions with regard to the appellant's alleged telephone call. Throughout this questioning Father Andrae consistently invoked the privilege.

On appeal to this court, the appellant makes the following arguments: (1) the District Attorney, in obtaining the appellant's confession, took unfair advantage of the appellant, who allegedly was incapable of knowingly and intelligently waiving his *Miranda* rights and, therefore, the confession

2.  Notes of testimony (hereinafter, N.T.) October 22, 1980, pp. 127–133.

3.  N.T. October 27–29, 1980, pp. 69, 70, 71, 72.

was improperly admitted at trial; (2) the appellant was denied a fair trial when the District Attorney was permitted to call Father Andrae to the witness stand and question him knowing that Father Andrae would invoke the priest-penitent privilege; (3) the appellant was denied a fair and impartial trial when the trial court, in its charge to the jury, imparted certain prejudicial remarks; (4) the appellant's trial counsel was ineffective in failing to object both to the fact that the jury was not sequestered and to the fact that the District Attorney, who obtained the appellant's confession, was also the prosecuting attorney. We shall discuss these claims of error seriatim.

Appellant's first argument is that his confession was obtained in violation of his *Miranda* rights. In support of this argument, the appellant contends that his confession was not voluntary since it was made while he was in an impaired physical and mental condition and that he was denied his right to counsel at the time of his confession.

■ In determining whether a confession is voluntary, this court must consider the totality of circumstances including the duration and method of questioning, the conditions of detention, the manifest attitude toward the appellant, the appellant's physical and psychological state and all other conditions which serve to drain one's power of resistance to suggestion and undermine his self-determination. *Commonwealth v. Betrand*, 484 Pa. 511, 399 A.2d 682 (1979); *Commonwealth v. Smith*, 470 Pa. 220, 368 A.2d 272 (1977). Ultimately, the test for voluntariness is whether the confession is the product of an essentially free and unconstrained choice. *Id.*

■ Having reviewed the entire record, we find no support for the appellant's argument. The interrogation lasted for approximately one hour. The appellant at all times possessed a rational and intelligent understanding of his role in the homicide and was anxious to relate to the interrogating officials everything that he knew. Furthermore, immediately following the confession, Dr. Widad Baz-

zoui, a psychiatrist then employed as a consultant to the Bradford Hospital, interviewed the appellant. At trial Dr. Bazzoui testified that throughout this interview, the appellant was not only alert, lucid and cognizant of his surroundings, but that he understood all that had transpired during his confession.[4]

The appellant also claims that he was under the influence of drugs and alcohol which made him vulnerable to interrogation. This argument is also unsupported by the record. In *Commonwealth v. Cornish*, 471 Pa. 256, 370 A.2d 291 (1977), the Supreme Court noted that before attempting a hospital interrogation, the proper procedure for determining the accused's physical and mental impairments, is for the interrogating officers to obtain an expert medical appraisal of the accused's condition. *See also, Commonwealth v. Hunt*, 263 Pa.Super. 504, 398 A.2d 690 (1979). This precautionary measure was followed in this case. Before interrogating appellant the District Attorney consulted the appellant's examining physician with regard to the appellant's physical and mental condition. The physician informed the District Attorney that no drugs were administered to the appellant and that the appellant did not appear to be under the influence of drugs or alcohol.[5]

■ The appellant contends further that he was denied his right to have an attorney present during his confession. It is clear from the record that the District Attorney conscientiously advised and reassured the appellant of *all* of his *Miranda* rights. At one point he told the District Attorney, "I don't know whether I should have a lawyer or not." [6] The appellant asserts that this was a request for an attorney that the District Attorney refused to honor. We disagree.

4. *Id.* pp. 20–26.

5. N.T. October 22, 1980, pp. 15–16.

6. The appellant also stated, "I imagine I should get a lawyer, that would be a legal proceeding." N.T. May 28, 1980, p. 43. However, this was said following his confession and before he was arraigned by the District Justice.

Before any questions were asked, the following colloquy took place:

MR. KAHLE: Carmen, I don't know if any of these fellows told you who I am or not. I'm Jay Paul Kahle, District Attorney. You may or may not have heard my name. You may know who I am.

I'm here and I'd like to ask you some questions with regard to Jean Engel and Jean's death.

Now, first, let me say to you at this point, yesterday you talked to some officers and they gave you some warnings, some statements that they wanted you to understand. I want to repeat those to you today.

Now, let me say one thing to you. Maybe it's a little hard for you to talk. The gal is taking this down, Mrs. Milliron so you can't indicate yes and no you have to say it to us yourself.

MR. MUSOLINO: Okay.

MR. KAHLE: Let me read these for you. You have the right to remain silent. You don't have to talk to us at all. Anything you say here today can be used against you and will be used against you and will be used as evidence against you in Court if there were a trial. You have the right now to talk to a lawyer. You can do that before we ask you any questions. You can have him here, do you understand that?

MR. MUSOLINO: Yeah.

MR. KAHLE: You don't have to be able to afford a lawyer. If you can't afford a lawyer we'll have one appointed to represent you, do you understand that also?

MR. MUSOLINO: Yes.

MR. KAHLE: Any time you want to stop answering questions while we're talking to you you have the right to stop. You can stop any time. You can ask us that you want to have a lawyer and you can stop.

MR. MUSOLINO: No, I want to answer everything. I don't know whether I should have a lawyer or not.

MR. KAHLE: You have to make that decision. You have the right to have a lawyer. If you want to go ahead

voluntarily and talk to us you have that right. Also, as we're talking to you you want to stop you indicate to me you'd like to stop we'll stop. Do you understand that alright?

MR. MUSOLINO: Yeah.[7]

In spite of these warnings, the appellant chose to confer solely with Father Andrae, a person in whom he could confide. Following a private conference with the priest, the appellant was again read his *Miranda* rights:

QUESTIONING BY MR. KAHLE:

Q. Okay, Carmen, did you get enough time with Father?

A. Yes.

Q. Let me once again reiterate the warnings. I'll read them to you, Carmen. At this point you have the right to remain silent. Before you answer any questions anything you say can be used and would be used against you in Court. You have the right to talk to a lawyer for advise [sic] before we ask you any questions. You have the right to have him with you during questioning. If you can't afford a lawyer that's no problem one will be appointed for you. Any time you want to stop answering questions or if you decide to answer questions now you still have the right to stop at any time and indicate to me you don't want to go any further. We won't go any further. Again also a lawyer would be provided for you. We didn't get you to sign this you might have signed one yesterday. Do you mind signing this. Take the cuffs off.

(Waiver of rights form signed.)[8]

Throughout the confession that followed, the appellant consistently stated that after having spoken to Father Andrae he was willing to speak openly of his actions.

In light of the circumstances discussed herein, we find that the appellant's confession was voluntary and that he was not deprived of his right to an attorney.

7. N.T. May 28, 1980, pp. 2–3.

8. *Id.,* pp. 8–9.

In his next argument the appellant claims that the trial court erred in permitting the District Attorney to call Father Andrae as a witness when, in fact, he knew that Father Andrae would assert the priest-penitent privilege and refuse to testify. The practice of questioning a witness, knowing in advance that the witness will invoke a privilege, is disfavored by the American Bar Association's Project on Standards for Criminal Justice:

> A prosecutor should not call a witness who he knows will claim a privilege not to testify, for the purpose of impressing upon the jury the fact of the claim of privilege. In some instances, as defined in the Code of Professional Responsibility, doing so will constitute unprofessional conduct.

ABA Standards Relating to the Prosecution and Defense Function, 3–5.7(c); *Commonwealth v. DuVal*, 453 Pa. 205, 216, 307 A.2d 229, 234 (1973).

This issue, as it relates to the priest-penitent privilege is a novel one in this jurisdiction and our research discloses that no other jurisdiction has passed on this issue. However, a number of jurisdictions, including Pennsylvania, have considered an analogous problem. The Pennsylvania Supreme Court, for instance, has held that the prosecution, once informed that a witness intends to claim the privilege against self-incrimination commits error in calling the witness where the witness is likely to be thought by the jury to be associated with the defendant in the incident out of which the criminal charges arose. *Commonwealth v. Virtu*, 495 Pa. 59, 432 A.2d 198 (1981); *Commonwealth v. DuVal, supra; Commonwealth v. Davenport*, 453 Pa. 235, 308 A.2d 85 (1973). *See also, e.g., Commonwealth v. Bellacchio*, 296 Pa.Super. 468, 442 A.2d 1147; *Shockley v. State*, Ala.Cr.App., 335 So.2d 659, aff'd Ala., 335 So.2d 663 (1976); *People v. Shipe*, 49 Cal.App.3d 343, 122 Cal.Rptr. 701 (1975); *Billings v. People*, 171 Colo. 236, 466 P.2d 474 (1970); *August v. State*, Fla.App., 187 So.2d 389 (1966); *People v. Myers*, 35 Ill.2d 311, 220 N.E.2d 297, cert. denied, 385 U.S. 1019, 87 S.Ct. 752, 17 L.Ed.2d 557 (1966); *State v.*

*Allen,* Iowa, 224 N.W.2d 237 (1974); *People v. Giacalone,* 399 Mich. 642, 250 N.W.2d 492 (1977); *State v. Cullen,* 103 N.J.Super. 360, 247 A.2d 346 (1968). Although these cases are factually distinguishable from the present situation, we hold that the underlying rationale for these decisions is controlling. That is, "[t]he prosecution may not suggest by indirection what is barred by the rules of evidence or testimonial privilege from demonstrating by direct testimony." *Commonwealth v. Wright,* 456 Pa. 511, 321 A.2d 625, 627 (1974).

█ In the instant case, we agree with the appellant that the interrogation of Father Andrae on the witness stand served no apparent purpose but to create an aura of appellant's guilt in his refusal to respond. In conducting his direct examination, the District Attorney was permitted to ask leading questions which, in effect, amounted to his own testimony before the jury—testimony which the appellant was unable to cross-examine:

Q. Did the individual on the telephone identify himself to you?

A. Based on section 5943 of the Judicial Code I cannot answer that question.

Q. In that phone call did you relay information with regard to the possibility of a suicide which may be going to happen at that time?

A. Based on section 5943 of the Judicial Code I cannot answer that question.

Q. Alright Father, I think we went through these once before with regard to this phone call. I'm only asking you as to information relating to a possible suicide attempt? Can you tell us please whether or not you relayed any information to the Officer with regard to a possible suicide attempt?

A. Pardon me, what's your question.

Q. Can you tell us, do you feel you can tell us any information with regard to whether or not in your phone call to the police station you advised them of the possibility of a suicide?

A. Based on section 5943 of the Judicial Code I cannot answer that question.

Q. I would assume then if your answer was or if I asked did you give the police any information relative to a homicide I'm assuming your answer would be the same, is that correct?

A. Based on 5943 of the Judicial Code I cannot answer.[9]

The record indicates that the District Attorney was well aware of Father Andrae's intent to invoke the privilege [10] and was likewise cognizant of the prejudicial impact of his leading and unanswered questions. As a result, the jury was left with the distinct impression that the appellant's conversation with Father Andrae was confidential and that the information withheld by the priest was of a confessional nature. In light of the appellant's inability to cross-examine either Father Andrae or the District Attorney, we believe that the prosecution took unfair advantage of the appellant. It was error for the trial court to permit this interrogation of Father Andrae by the District Attorney.

However, under the circumstances of this case, we hold that such error was harmless beyond a reasonable doubt. In *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978), the Supreme Court held that erroneously admitted evidence is considered harmless when it is merely cumulative of other untainted evidence. See also, *Commonwealth v. Knight*, 469 Pa. 57, 364 A.2d 902 (1976).

In the present case, we find that the evidence contained in the appellant's confession was largely uncontroverted and so overwhelming as to render harmless the District Attorney's prejudicially leading questions. Furthermore, the testimony that the District Attorney attempted to elicit from Father Andrae was substantially similar, if not identical, to the information disclosed in the detailed confession.[11] Since the District Attorney's interrogation of Father Andrae,

**9.** N.T. October 27–29, 1980, pp. 145–46.

**10.** N.T. October 22, 1980, pp. 127–33; October 27–29, 1980, p. 69.

**11.** N.T. May 28, 1980, pp. 29–30.

which we now condemn, added nothing to the Commonwealth's case, we hold that beyond a reasonable doubt the appellant was not harmed. *Commonwealth v. Knight, supra.*

In his next argument, the appellant claims that certain remarks and opinions made by the trial court during its charge to the jury deprived him of a fair and impartial trial.

The appellant asserted the defense of insanity at trial and in support of his argument he focuses on portions of the court's charge which (1) referred to the psychiatrists and psychologists who testified on his behalf as "headshrinkers"; (2) informed the jury that if they were to render a verdict of not guilty by reason of insanity, the appellant would be examined by these psychiatrists and let free; and (3) impressed upon the jury that there was no such verdict as "not guilty by reason of insanity."

In determining whether the trial court's charge to the jury was fair and non-prejudicial, the charge must be read and considered as a whole. *Commonwealth v. Peterson,* 271 Pa.Super. 92, 412 A.2d 590 (1979). The court's instructions may not contain any prejudicial expression of guilt or invade the province of the jury. *Commonwealth v. Betrand, supra.* Furthermore, while every unwise or irrelevant remark made in the course of a trial by a Judge does not compel the grant of a new trial, a new trial will be warranted when the remark is prejudicial, that is, when it is of such a nature or substance or delivered in such a manner that it may be reasonably said to have deprived the appellant of a fair and impartial trial. *Commonwealth v. Goosby,* 450 Pa. 609, 301 A.2d 673 (1973).

In support of his insanity defense, the appellant, at trial, presented the testimony of psychiatrists and psychologists. As part of its charge to the jury, the trial court properly instructed the jury on the elements of the insanity defense:

[The Court]

Also in this case would be a verdict ... of not guilty by reason of insanity....

. . . . .

Next, under insanity. First that to establish that the defendant is not sane the evidence must show that at the time that the defendant committed the act, he either did not know the nature and quality of the act or he did not know that it was wrong.

Two. That, the current law in Pennsylvania does not recognize the defense of irresistible impulse.

Third, that the law of Pennsylvania that evidence of lay witnesses can be sufficient to establish the sanity of defendant who has offered expert testimony as to his insanity. The difference between a lay witness and an expert witness would be that an expert witness has the training and education in a certain field. Whereas a lay witness is just a normal, ordinary person who doesn't have any special training.[12]

Toward the end of its charge, however, the court erroneously instructed the jury that in the event that the jury returned a verdict of not guilty by reason of insanity, the appellant would be imprisoned for life. The District Attorney's exception to this charge prompted a disagreement among both counsel and the trial judge as to what would happen to the appellant if the jury found him not guilty by reason of insanity. The disagreement centered around certain portions of the Pennsylvania Mental Health Procedures Act (hereinafter, "Act"), 50 Pa.C.S.A. § 7101 *et seq.* regarding the appellant's mental competency to stand trial and his mental competency following the trial.

Following an extensive sidebar colloquy on the matter, the trial court read to the jury certain portions of the Act:

12. N.T. October 27–29, 1980, pp. 359, 376. This charge conforms, basically, to that set forth in the draft of the Pennsylvania Standard Jury Instructions on the Insanity Defense, 5.01A. Recently, the Crimes Code and the Judicial Code have been amended to include the verdict of "Guilty but mentally ill." 18 Pa.C.S.A. § 314.

The Court:

[T]his is under the mental health act and entitled examination of a person charge [sic] with a crime as an aid in sentencying [sic] examination before imposition of sentence.  Every person who has been criminally charged is to be sentenced, the Court may defer sentence and order him to be examined for mental illness to aid in the determination of disposition.  This action may be taken on the Court's initiative or on Commonwealth, the person charged, his counsel or any other person acting in his interest.  If at the time of sentencing, the person is not in detention, examination shall be made as an out patient basis unless in patient examination for this purpose is ordered pursuant to the civil committment [sic] provisions under article three.  But that's examination before imposition of any sentence.

.    .    .    .    .

... 406 says upon finding of incompetency to stand trial, but the testimony was he was competent you heard the testimony right from the witness stand from the psychiatrist in Warren that he was competent to stand trial, but I'll read it.  Upon a finding of incompetency to stand trial under section 403, after an acquittal by reason of a lack of responsibility under section 404 or upon examination in aid of sentencing under section 405, the one I just read you, the attorney for the Commonwealth on his own or at the direction of the Court, defendant, his counsel, county administrator, or any other interested party may petition the same Court for an order directing involuntary treatment.  It doesn't say anything about not guilty by reason of insanity.[13]

In an attempt to correct its prior erroneous instruction, the court charged the jury as follows:

I said that a not guilty by reason of insanity verdict would subject him to life imprisonment; that is not true and you're to disregard that instruction.

13.  N.T. October 27–29, 1980, pp. 391–392, quoting from 50 Pa.C.S.A. § 7405, 7406.

What happens is, if a verdict of not guilty by reason of insanity was brought in then in effect there would be an examination of the defendant and a civil committment [sic] would be and in this case to Warren State Hospital and if they find him competent then he is free.

So, I think the burden is on you from the testimony you heard yesteresday [sic] is he competent now and of course, initially was he insane at the time of the crime, but if that is true you'll have to determine that. If you find that he was competent during the time of this trial then there would be a petition by the District Attorney for a civil committment [sic] which would be Warren and in effect with our experience with Warren, if he was found competent there then he's a free man." [14]

The court reiterated this instruction:

Mr. Yoder says thirty days to detain him and then a civil committment [sic]. In any event, thirty days or freedom, there would be a civil committment [sic] to Warren State Hospital. If they find him competent and the head shrinkers said yesterday he was competent, he'll be a free man. [15]

At the end of its charge the court repeated this instruction in the following manner:

[I]f you bring in a verdict of lack of criminal responsibility, he would be examined at Warren by the same people that were here yesterday and you know what they're going to say and he goes home. Thank you very much. [16]

*Id.*, p. 394.

In the case of *Commonwealth v. Mulgrew*, 475 Pa. 271, 380 A.2d 349 (1977), the Pennsylvania Supreme Court held that a trial court should instruct the jury concerning the possibility of commitment proceedings being initiated against a defendant if such defendant is acquitted on the ground of insanity. The court reasoned that a verdict of

14. N.T. October 27–29, 1980, p. 390.

15. *Id.*, p. 393.

16. *Id.*, p. 394.

"not guilty by reason of insanity" means that a defendant is neither *free* nor *punished* but that he will be confined in a hospital for the mentally ill until the superintendent of such hospital and the court is satisfied that such person has recovered his sanity and is no longer dangerous to himself and others. Moreover, since the jury is not readily familiar with the consequences of the verdict of not guilty by reason of insanity, the court should accurately advise the jury of its meaning in order to assist them in properly determining a defendant's guilt or innocence. *Commonwealth v. Mulgrew, supra,* 475 Pa. at 276, 380 A.2d at 352. This instruction is incorporated into the draft of the Pennsylvania Standard Jury Instructions on the Insanity Defense. Based on certain provisions of the Act, this instruction reads as follows:

(6) In determining questions of sanity and guilt you really should not concern yourself with what will happen to the defendant if you find him not guilty—whether he will be set free or whether he will be confined to a mental hospital for treatment. You should apply the law that I give you to decide the case and assume that, whatever your verdict, the authorities will make a wise disposition of the defendant. I will tell you, however, that when a defendant is found not guilty as a result of insanity, he may be the subject of an immediate court proceeding to commit him to a mental treatment facility and, if committed, his commitment will continue until he is no longer dangerous to others or to himself.

§ 5.01A. Revised Instruction Subcommittee Draft, February 2, 1978.

*See also,* Pennsylvania Mental Health Procedures Act, 50 Pa.C.S.A. §§ 7301, 7304, 7305, 7406. The purpose of this instruction is not only to prevent possible unwarranted convictions but to alleviate any fears that the jury may have that a dangerously insane defendant may be turned loose.

■ In the instant case, the trial court's instructions did not fulfill either one of these purposes. In our view, the court's instructions were not only inaccurate and confusing

but grossly misleading and prejudicial even when viewed in the context of the entire charge. The court's use of the term "headshrinkers", with reference to the psychiatrists and psychologists, was discrediting to the witnesses and had no place in this proceeding. Furthermore, it is apparent that the court was confusing the question of the appellant's competency at the time of trial and the question of his competency following the trial with the true issue of whether the appellant was sane at the time of the homicide.[17]

Such confusion was demonstrated initially in the court's erroneous instruction that it was the jury's responsibility to determine the appellant's competency during the trial.[18] The court then told the jury that, based on the psychiatric testimony heard the day before, the appellant, in fact, was mentally competent at the time of his trial. This charge was not only irrelevant with respect to the true issue in this case, but was erroneous in that all of the psychiatric testimony at trial referred primarily to the appellant's mental condition at the time of the homicide. In focussing the jury's attention on the question of the appellant's competency during the trial, we believe that the trial court confused the jury and therefore may have misled them into determining that the appellant was "competent" or sane when he committed the homicide. In this respect, the court's actions were tantamount to an invasion of the jury's province.

Further prejudice toward the appellant was exhibited when the court commented to the jury that upon their return of a verdict of "not guilty by reason of insanity," the appellant would be determined mentally competent and set

17. The appellant cites another portion of the jury instructions which he believes constituted reversible error. In one instance, the court commented that a new trial resulting from a hung jury would involve a "tremendous expense to the taxpayers." N.T. October 27–29, 1980, p. 379. While we agree that this remark was unnecessary and irrelevant, it does not, in itself, require a reversal, especially since the trial court emphasized at the time that it was not directing the jury to be unanimous.

18. N.T. October 27–29, 1980, pp. 390, 393, 394.

free by those psychiatrists who *later* were to examine him. Earlier in the trial, the jury had heard overwhelming evidence of the appellant's role in the homicide, so, naturally, at the time of deliberation, a concern for the safety of the community must have been foremost in their minds. The trial court's comment, which was made immediately before the jury retired to deliberate, undoubtedly produced a chilling effect on the jury's ability to render an impartial verdict.

In addition to the foregoing prejudicial remarks, the trial judge, at one point in the charge to the jury, stated, "Frankly, I don't think there's—my opinion is there's no sentence of not guilty by reason of insanity." N.T. October 27–29, 1980, p. 393, and, at another point, stated, "Well it would have to be lack of criminal responsibility instead of not guilty by reason of insanity, in my opinion." *Id.*, p. 394. The Commonwealth argues that these statements did not prejudice the appellant's case as they were made in the context of an explanation of the Act, *supra.* We disagree with this contention.

The trial judge, in this instance, thought it appropriate to discard the term "not guilty by reason of insanity," which he had used in the standard instructions to the jury, and adopt in its place the term "acquittal by lack of criminal responsibility" which is used in the Act. We find that this did nothing more than to mislead the jury into concluding that there was no such verdict of "not guilty by reason of insanity." Since this is not the law in Pennsylvania, *see e.g., Commonwealth v. Hicks*, 483 Pa. 305, 396 A.2d 1183 (1979), we believe that the trial judge's statements were unduly prejudicial to the appellant's insanity defense.

In light of the foregoing considerations we hold that the appellant was deprived of a fair and impartial trial.

444

The judgment of sentence is vacated and this case is remanded for a new trial.[19] This court does not retain jurisdiction.

19. Having determined that a new trial is warranted in this case, we do not find it necessary to address the issue of whether the appellant's defense counsel was ineffective.