417 A.2d 1243

COMMONWEALTH of Pennsylvania

v.

Raymond E. THOMPSON, Appellant.

Superior Court of Pennsylvania.

Argued Sept. 12, 1979.

Filed Dec. 28, 1979.

Norris E. Gelman, Philadelphia, for appellant.

Franklin L. Noel, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, HESTER and CAVANAUGH, JJ.

CAVANAUGH, Judge:

Raymond Thompson was convicted of burglary, robbery, criminal conspiracy and aggravated assault in a non-jury trial. After denial of his post verdict motions and the imposition of sentence, he presents two questions on appeal to this Court.

Appellant argues that there was an insufficient showing of theft to support the robbery conviction or the burglary conviction under the information. He further argues that he raised the issue of insanity in his testimony and that the Commonwealth failed in its burden of proving sanity.

We find no error and affirm the judgment of sentence.

In the late afternoon of January 5, 1977, the doorbell rang in the residence of Mrs. A. Charles Peruto at 1622 North 72nd Street in Philadelphia. Looking through a peephole in the door, Mrs. Peruto viewed, standing alone outside, a young woman carrying a bouquet of flowers. She proceeded to open the door when it was suddenly shoved into her body, and three or four men came in with guns. One man grabbed her by the mouth, buried her head into his chest and said, "keep quiet and you won't get hurt". Mrs. Peruto was dragged across to her kitchen door. After emitting several screams, Mrs. Peruto's son appeared at the door to his basement apartment and when he demanded that his mother be released, the appellant shot at him. Mr. Peruto had managed to close the basement door and the shot went through it and missed him. Mr. Peruto then feigned calling for assistance and getting a weapon. Appellant said, "Let's

get the hell out of here" and the invaders ran out the front door. Mrs. Peruto then heard a car screeching.

## I ·

At trial the appellant testified in his defense and immediately went into a narrative of his personal history including his mental state, and referred to the "consciousness" of Raymond Thompson abandoning Raymond Thompson. When called to side-bar in order for the court to inquire about relevancy, counsel advised the court "It's his defense of madness". "It's an insanity defense". Thereafter, the defendant testified at length in a rambling fashion which expanded on personal history and the death of the consciousness of Raymond Thompson. He spoke of columns of numbers that talk to one another. There was no reference to the crime on trial until the very end of his direct testimony when defendant in responding to a question about his condition in January of 1977 stated:

A I could rationalize a whole lot things, man, but I'm telling you, man, it was just one of them things. I was just floating through something, man. You think that I would do what I did if I wasn't goddamned out of it? No way would I have done it.

On cross-examination the following took place:

By Mr. Castille:

Q When you say that you did it, are you talking about you did this crime?

A No. I figured you was going to pick up on that right away.

Chances are Raymond did this, certainly.

Q When you say you did it, you're saying Raymond Thompson robbed?

A The Raymond that died in Bucks County, man. You don't have to believe me, you understand. I'm just running it down the way I know.

Q I don't doubt your words, Mr. Thompson.

A Thank you.

Q This person that you knew as Raymond Thompson, who died in Bucks County prison, is that the person that went to the Perutos house with a gun?

A In all probability it was, man.

■ The law of Pennsylvania with respect to raising the issue of insanity is stated in *Com. v. Demmitt*, 456 Pa. 475, 483, 321 A.2d 627, 632 (1974):

> [T]he law in Pennsylvania is that in order to establish insanity, a defendant must still meet at least one part of the two-pronged M'Naghten test. There must be evidence in the case from whatever source that he did not know the nature and the quality of his act or that he did not know that it was wrong. When he offers evidence of that insanity, the Commonwealth can no longer rely upon a presumption of sanity, but instead must offer evidence to show that he was sane.

Here, appellant alleges that his testimony raised the issue of insanity, and that the Commonwealth could no longer rely on any presumption of sanity, but rather had the burden of proving sanity beyond a reasonable doubt. *Demmitt* does not furnish us with a standard or test by which we can determine if the issue of insanity may be said to have been raised. Certainly it would work an unreasonable mischief if at the conclusion of every case the court on request had to send an insanity issue to the jury simply on the insistence of the defendant that a view of all the evidence raises the issue and requires a determination of whether the Commonwealth has proved sanity. It appears, then, that there must be a threshold determination by the trial judge to determine if the *Demmitt* rule comes into play. The trial court must decide if the "evidence in the case from whatever source" is sufficient to raise the issue of insanity.

■ The Commonwealth argues that the appellant failed to produce evidence of insanity; that nowhere in his evidence did appellant show that he did not know the nature and quality of his act or that he did not know it was wrong. It is true that *Demmitt* requires an examination of the

record to determine if there is evidence sufficient to raise the issue of insanity. *Com. v. Brown*, 462 Pa. 578, 342 A.2d 84 (1975); *Com. v. Harper*, 479 Pa. 42, 387 A.2d 824 (1978); *Com. v. Hughes*, 480 Pa. 311, 389 A.2d 1081 (1978). However, a fair reading of the appellant's testimony here reveals that the appellant claims no knowledge of the incident and that if anyone took part in the invasion of the Peruto household it was the "consciousness" of Raymond Thompson, a separate person who died later in Bucks County prison. Of course, if this state of mind is to be believed, it would negate knowledge of the nature and quality of the act or knowledge of its wrongfulness by the man on trial. It would seem, therefore, that the issue of insanity must be considered.

Once raised the issue becomes one for the fact finder. The initial question must be whether the issue has been creditably raised or whether it is simply an artifice. Of course, if the fact finder decides on initial examination that the evidentiary source of the insanity issue is wholly contrived, that it is a complete sham, the evidence is rejected and there is no insanity issue for the Commonwealth to meet. This is the precise case here. In this non-jury case the trial judge in his opinion following post trial motions stated: "the court found the defendants insanity testimony to be a complete sham. The story concocted by Thompson demonstrated his intelligence and his awareness of the situation." This was an issue best decided by the fact finder and our examination of the record leads us to conclude that his finding should not be disturbed. As was stated in *Com. v. Norman*, 259 Pa.Super. 301, 306, 393 A.2d 837, 840 (1978), "T(o) hold otherwise would be to offer every actor with a modicum of acting ability an opportunity to escape criminal responsibility".

## II

Appellant alleges that the Commonwealth failed to prove that he intended to commit theft after entering the home and that, therefore, he could not be convicted of

burglary. In charging burglary the Commonwealth is not required to specify in the indictment or information what crime the accused allegedly intended to commit. But when the prosecutor chooses to specify a crime, as here, where intent to commit theft was specified, the burden of proving intent to commit that specific crime is assumed. *Com. v. Jacobs*, 247 Pa.Super. 373, 372 A.2d 873 (1977). We must then examine the evidence and the reasonable inferences arising from the evidence and ask if they are sufficient to prove beyond a reasonable doubt that Thompson had the intent to commit theft when he entered the Peruto home. The intent may be inferred from the words and conduct of the defendant and his confederates at the time of the incident, as part of the attendant circumstances. That is, intent to commit theft as an element of the crime charged may be proven by circumstantial evidence. *Com. v. Simmons*, 233 Pa.Super. 547, 336 A.2d 624 (1975).

Recently, in *Com. v. Madison*, 263 Pa.Super. 206, 397 A.2d 818 (1979), this Court examined the very issue before us now. That case recognized that in some cases the evidence clearly contradicts intent to commit theft after entry into a building. One such case is where the defendant leaves the structure empty handed even though there were valuables therein. *Com. v. Freeman*, 225 Pa.Super. 396, 313 A.2d 770 (1973). Other considerations are: the type of building entered, *see, e.g. Com. v. Corbin*, 251 Pa.Super. 512, 380 A.2d 897 (1977) (reasonable inference of intent to commit theft when entry is into a commercial building after business hours); building believed to be unoccupied (most crimes other than theft would require a human victim), *see, e.g. Com. v. Shannon*, 244 Pa.Super. 322, 368 A.2d 742 (1976); or the belief that the structure contains valuables, *see, e.g. Com. v. Jacobs*, 247 Pa.Super. 373, 372 A.2d 873 (1977), (not reasonable to infer intent to commit theft when defendant entered recently vacated apartment containing only a refrigerator, stove and sink). We must remember that the law

cannot catalog all those circumstances from which an intent to commit theft might be inferred and that inferences are not the exclusive domain of the lawyer but flow from logic and experience. Here, although the building was occupied and thus a crime involving a human victim could have been intended, there is nothing to suggest that the defendant and his confederates knew the building was occupied or that a crime against a human victim was intended. They came upon a private home, a place likely to contain valuables, at dusk. A young lady appeared alone at the door carrying flowers. She was seen from inside and the door was opened by Mrs. Peruto. Immediately three or four men entered. They were armed. Thus, it appears that the group intended to find if someone was home through a ruse and they were prepared to accomplish their goals even if the dwelling was occupied since they had the advantage of numbers and were carrying pistols. The evidence negates any inference that the intent was to commit a crime upon the person of Mrs. Peruto or to remove her from the premises. She was told, "Keep quiet and you won't get hurt" and was dragged from the doorway area to the kitchen door. Her screams then brought her son from his apartment on a lower level of the house to the door at the bottom of the stairs. A shot was fired at him by the defendant as he slammed the door to the stairway.[1] Mr. Peruto feigned getting assistance by yelling for "Ed and Steve" who were not there and made a noise with a drawer as if to get a gun out and again yelled a threat upstairs. At this time the invaders were all running out the front door and disappeared with a screech of brakes. We have, then, an armed group of persons who sought entry into a private home. While it appears that they were prepared to deal with a person inside they were thwarted when a young man, possibly with others, and threatening to retaliate, came onto the scene. This, in addition to the knowledge that he had been shot at by Thompson and may

1. The bullet went through the door and was later recovered by an investigating detective.

have been injured, was sufficient to cut short their adventure and flee. We cannot say that Judge Anderson as the fact finder erred in concluding that there was the requisite intent to commit theft to support the burglary conviction.

 Much of what we have said applies to appellant's attack on the robbery charge as well. Robbery is defined as follows:

(1) A person is guilty of robbery if, in the course of committing a theft, he:

(i) inflicts serious bodily injury upon another;

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury; or

(iii) commits or threatens immediately to commit any felony of the first or second degree.

(2) An act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission.[2]

One of the elements of robbery is that it be in the course of committing a theft or an attempt to commit a theft, and of course, the burden is on the Commonwealth to prove theft or an attempt to commit a theft. An attempt requires an intent to commit a crime, and any act that constitutes a substantial step toward the consummation of that crime. 18 Pa.Const.Stat. § 901; *Com. v. Butch*, 238 Pa.Super. 524, 361 A.2d 380 (1976). From our analysis above we conclude that there was sufficient evidence of an intent to commit theft. Having so concluded, there is abundant evidence that the appellant and his companions had taken substantial steps toward the commission of the crime before their progress was frustrated by the intervention of Mr. Peruto.

Judgment of sentence affirmed.

SPAETH, J., concurs in the result.

2. Pa.Const.Stat.Ann. § 3701.