502 A.2d 1241

**COMMONWEALTH of Pennsylvania**

v.

**Victor BELMONTE, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 2, 1984.

Filed Nov. 8, 1985.

Reargument Denied Jan. 13, 1986.

4

Paul D. Boas, Pittsburgh, for appellant.

Kemal A. Mericli, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before BROSKY, TAMILIA and ROBERTS, JJ.

TAMILIA, Judge:

This is an appeal from the judgment of sentence entered on November 22, 1982. Appellant, Victor Belmonte, Jr., was convicted of four counts of third degree murder after a bizarre incident in which he ran amok and shot five of his neighbors from his father's house in Coráopolis, Pennsylvania. Appellant raises several substantive and procedural issues, a number of which concern his defense of insanity. After conducting a thorough review of the record in which this Court has painstakingly considered all of appellant's arguments, we affirm. While we basically agree with the conclusion of the lower court, the difficult issues in this case require us to expound on them.

The relevant facts are as follows. At the time of the incident in question, Victor Belmonte, Jr., the appellant, was 23 years old. He was a quiet and introverted young man who came from a closely knit family in Coraopolis. A somewhat unsuccessful stint in college coupled with being laid off from a job led the appellant to enlist in the United States Army. Having found his niche in life, appellant re-enlisted several times and was assigned to an intelligence gathering agency of the United States Army. Due to the nature of his work, which involved monitoring and intercepting Warsaw Pact Troop Transmissions, the appellant had the highest security clearance one can achieve in the military. His work also included weapons training and constant maneuvers wherein his unit would set up defensive positions in order to prepare for an enemy attack.

In March, 1979, the appellant was transferred to Pittsburgh, Pennsylvania, because his mother was dying of cancer, and remained in the military service for another year. Appellant's mother died in the spring of 1980 and appellant, following his discharge, received a civilian job with the U.S. Army in the Pittsburgh area.

In July of 1980, prior to attending Army summer camp at Fort Indiantown Gap in central Pennsylvania, and following the death of his mother, appellant became increasingly withdrawn and reclusive, avoiding almost all social interactions. His condition deteriorated further and he became extremely uncomfortable with his stay at the camp. Appellant's state of unrest culminated on the morning of July 20, 1980, when he left Fort Indiantown Gap and began walking toward Pittsburgh for ten hours. Eventually, appellant hitched a ride for part of the journey and took a train the rest of the way. Upon arriving in downtown Pittsburgh, appellant decided to take a bus to Coraopolis. At the bus stop, appellant was greeted by an old friend, yet he failed to even acknowledge him.

When appellant arrived at his father's home, he found the house empty. He proceeded to take a shower, drank a glass of milk, and then became frightened that people were

closing in on him. Believing that some type of enemy attack was imminent, the appellant loaded several weapons, including a .35 caliber Marlin action rifle. He advanced to the third floor of the house from where he shot five of his neighbors on the street, killing four and wounding the fifth. Compounding the tragedy, most of the victims were people the appellant had known all of his life and with whom he was friendly.

Following the shooting, appellant ran down the stairs to the first floor, placing his weapons by the front door in an orderly manner. Appellant then left his home, took his automobile and drove around aimlessly for about an hour until he entered the Pennsylvania State Police Barracks in Carnegie at approximately 7:15 p.m. Elizabeth Blumer, the radio and desk operator at the State Police Barracks, was apparently the first person to encounter appellant after the killings. She testified he was not visibly shaken nor did he exhibit any nervousness when he appeared before her desk window. Appellant patiently waited when Blumer, who was taking a phone call, indicated that she would attend to him after she finished the call. Upon completion of the phone call, Blumer, joined by Cpl. John Kutchman, motioned to appellant to open the window and communicate his concern to them. Appellant then calmly stated, in a normal tone of voice, that he had just shot four people. At this time, he made no reference to these people being the "enemy" nor did he use language couched in military terminology. In a peaceful fashion, appellant accompanied Cpl. Kutchman to a private room to talk further about the incident. Appellant was advised of his *Miranda* rights, which he waived after being fully informed and then proceeded to describe the incident exactly. In a calm manner and without hesitation, appellant stated that "[w]e met the enemy at our position in Coraopolis." (N.T. 54). Appellant was then fingerprinted and turned over to the custody of Allegheny County Homicide Detectives, who informed him that he was being charged with four counts of criminal homicide and again advised him of his constitutional rights. At approximately

10:15 p.m., appellant gave the Allegheny County detectives a more detailed but essentially identical statement. Appellant indicated that he understood his rights and was at all times responsive to questioning.

Appellant filed an application to permit psychiatric and psychological examination by Dr. Thomas Eberle, Ph.D., on August 13, 1981, which was granted by the Honorable George H. Ross. A second application to permit psychiatric and psychological examination by Dr. Melvin Melnick, M.D., was filed on September 8, 1980, and granted on that same date by the Honorable Robert E. Dauer.

On December 30, 1980, after application and hearing, the Honorable John W. O'Brien ordered appellant committed to Farview State Hospital for 90 days, pursuant to section 403 of the Mental Health Procedures Act of 1976, as amended, 50 P.S. § 7402. At the same time Judge O'Brien denied appellant's request for a determination of criminal responsibility pursuant to 50 P.S. § 7404(a), leaving that matter for determination at trial. Subsequently, appellant was found competent to stand trial and on August 17, 1981, Judge O'Brien considered and denied a motion to reconsider application for pre-trial acquittal by reason of insanity pursuant to 50 P.S. § 7404(a).

After a trial before Judge O'Brien and a jury, appellant was convicted of four counts of third degree murder and acquitted on the counts of attempt and aggravated assault. Post trial motions were timely filed, argued and in due course denied. On November 22, 1982, appellant was sentenced to two consecutive terms of imprisonment of 10 to 20 years, to run concurrently with two additional 10 to 20 year terms. The instant appeal followed.

Appellant first contends that the Commonwealth failed to provide sufficient evidence that he was sane at the time he committed the murders. We disagree.

Appellant's sole defense at trial was that he was legally insane when he committed the offenses charged. Appellant does not challenge the M'Naghten rule which is

the prevailing standard for legal insanity in Pennsylvania. Under M'Naghten, an accused is legally insane if "at the time he committed the act, either he did not know the nature and quality of the act or he did not know that it was wrong." *Commonwealth v. Demmitt,* 456 Pa. 475, 481, 321 A.2d 627, 631 (1974). In elaborating upon this test, our Supreme Court has noted that:

> It is not intended to separate the emotionally disturbed defendants from the emotionally healthy. Rather, it is intended to include defendants, both disturbed and healthy, among those who are held criminally responsible....

*Id.,* 456 Pa. at 481, 321 A.2d at 631. Thus, the mere fact that an accused may have a history of mental illness does not mean that he is legally insane. *Commonwealth v. Tempest,* 496 Pa. 436, 437 A.2d 952 (1981); *Commonwealth v. Tyson,* 485 Pa. 344, 402 A.2d 995 (1979); *Commonwealth v. Pifer,* 284 Pa.Super. 170, 425 A.2d 757 (1981). Even extreme mental illness does not compel a finding of not guilty by reason of insanity. *Commonwealth v. Bruno,* 466 Pa. 245, 252 n. 3, 352 A.2d 40, 44 n. 3 (1976). Rather, the accused is legally insane *only* if at the time of the crime he either did not appreciate the nature and quality of his act or did not know that it was wrong. *Commonwealth v. Metzler,* 499 Pa. 122, 451 A.2d 1352 (1982); *Commonwealth v. Bruno, supra.* "Conversely, in order for the Commonwealth to sustain their burden of proving appellant was sane, they must prove that appellant did know the nature and quality of his act and did know that it was wrong." *Commonwealth v. Pifer,* 284 Pa.Super. at 176, 425 A.2d at 760.

 In cases where there is sufficient evidence to raise the issue of insanity, such as here, the burden of proof is upon the prosecution to establish sanity beyond a reasonable doubt.[1] *Commonwealth v. Bruno, supra; Common-*

---

1. Appellant relies on *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), for the proposition that once the burden of persuasion regarding sanity shifts to the Commonwealth, the defend-

*wealth v. Tyler, supra; Commonwealth v. Delker,* 467 Pa. 305, 356 A.2d 762 (1976); *Commonwealth v. Thompson,* 274 Pa.Super. 44, 417 A.2d 1243 (1979). We emphasize that this burden may be met by the testimony of lay witnesses. *Commonwealth v. Zlatovich,* 440 Pa. 388, 269 A.2d 469 (1970).

■ The crux of the problem in the instant case is that the defense presented expert testimony of appellant's insanity[2] while the Commonwealth relied solely on the testimony of lay witnesses and the vigorous cross-examination of the appellant's expert witnesses. However, as stated previously, the testimony of a lay witness may be sufficient to establish sanity, *Commonwealth v. Zlatovich, supra,* and the prosecution need not offer expert testimony in order to rebut expert testimony on behalf of the accused. *Commonwealth v. Tyson, supra; Commonwealth v. Bruno, supra.* "The only requirement is that there must be sufficient evidence from *any source whatsoever* to support a finding of sanity beyond a reasonable doubt. *Common-*

ant's sanity thereby becomes an element of the crime which the Commonwealth must establish beyond a reasonable doubt. While it is generally applicable, appellant's reliance on *Winship* is misplaced. As present Chief Justice Nix stated in his Concurring Opinion in *Commonwealth v. Demmit,* 456 Pa. 475, 483–5, 321 A.2d 627, 632–33 (1974):

> In my understanding, the majority's use of the term "presumption of sanity" does not imply a shifting of either the burden of production or persuasion; rather it is merely an attempt to express the view that the Commonwealth's burden in this regard can be satisfied from its proof of the events surrounding the commission of the crime and the accused's apprehension.

*See also Commonwealth v. Vogel,* 501 Pa. 314, 320–23, 461 A.2d 604, 607–08 (1983) (reaffirming view that sanity was not necessarily an element of the crime but may relate solely to whether the accused possessed sufficient awareness to be deemed criminally responsible). Subsequent to the trial of the instant case, the Pennsylvania Legislature enacted a new law establishing a verdict of guilty but mentally ill. While preserving the insanity defense, this law has shifted the burden to the defense to prove insanity by a preponderance of the evidence. Act of December 15, 1982, P.L. 1262, No. 286, § 1, 18 Pa.C.S.A. 314–15 (Supp.1983).

**2.** At trial, the appellant presented expert psychiatric testimony from Dr. Thomas M. Eberle, Dr. Melvin Melnick and Dr. Ronald T. Refus.

*wealth v. Demmitt, supra.*" *Commonwealth v. Tyson,* 485 Pa. at 352–3, 402 A.2d at 999.

In the instant case, the Commonwealth has presented such evidence of appellant's sanity, despite the strong evidence that appellant is indeed mentally disturbed.[3]

In *Commonwealth v. Demmitt, supra,* the defense offered the testimony of four psychiatrists, one of whom stated that the defendant was " 'completely disassociated, absolutely insane .... he did not know the difference between right and wrong.' " *Id.* 456 Pa. at 477, 321 A.2d at 629. Like the present case, in *Demmitt,* the Commonwealth offered no professional psychiatric witnesses on the subject of appellant's sanity and relied solely on lay testimony. Consequently, the *Demmitt* Court held that the Commonwealth had legitimately relied on the lay testimony "of witnesses concerning the defendant's actions, conversations and statements at the time of the killing from which the jury could find that he knew what he was doing when he killed and knew it was wrong." *Id.,* 456 Pa. at 483, 321 A.2d at 632. *See also Commonwealth v. Green,* 493 Pa. 409, 426 A.2d 614 (1981); *Commonwealth v. Frisbie,* 318 Pa.Super. 168, 464 A.2d 1283 (1983), *rev'd on other grounds,* 506 Pa. 461, 485 A.2d 1098 (1984).

■ The reasoning of *Demmitt* is directly applicable to the present case. While the appellant produced expert testimony from three psychiatrists who were all of the opinion that he was legally insane, such testimony was at times inconsistent and failed to explain certain instances of the appellant's behavior.[4] Therefore, we find that the jury was free to discount such testimony.

3. The lower court similarly stated its conclusion that "[w]hile this is not an overwhelming case of sanity, substantial evidence did exist from which the jury could conclude defendant was sane under M'Naghten at the time of the shootings." (Slip Op. at 4)

4. This conclusion was also reached by the lower court, which in its Opinion stated:

Testimony indicated defendant abandoned his weapons inside the house and then fled the scene in his car, after which he drove "aimlessly" for a period of time before deciding to report the

It is clear that the elements of a crime can be proven by circumstantial evidence, as provided by the Commonwealth's witnesses in the present case. *See Commonwealth v. Sinwell*, 311 Pa.Super. 419, 457 A.2d 957 (1983). Further, the jury was provided with the proper instruction regarding how the use of a deadly weapon upon the vital parts of another person's body provides the necessary element of malice. *Commonwealth v. Bishop*, 489 Pa. 96, 413 A.2d 1031 (1980); *Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976).

■ In addition, we point out that our standard of review on appeal is limited. *Commonwealth v. Whitfield*, 475 Pa. 297, 380 A.2d 362 (1977). We reiterate that psychiatric testimony, like any other evidence, is for the trier of fact to consider in determining what weight it should be given. *Commonwealth v. Whitfield, supra; Commonwealth v. Davis*, 462 Pa. 27, 31, 336 A.2d 888, 890, *cert. den. sub nom., Davis v. Pennsylvania*, 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975); *Commonwealth v. McCusker*, 448 Pa. 382, 292 A.2d 286 (1972). Our independent examination of the entire record leads us to conclude that the jury, sitting as trier of fact, had adequate evidence from which to conclude that the Commonwealth had borne its burden of proving Belmonte's sanity under the M'Naghten test. We

shootings. Moreover, he did not go to the U.S. Army base at Oakdale, Pennsylvania, where he worked as a civilian (or any other military installation), to report an enemy attack. Rather, he walked into a police station and calmly announced he had just shot four "people." During his first interrogation (at the State Police Barracks) defendant identified one of the victims as "Joe Olinger," and was able to spell his name. T.T., 53. During his second interview (at County Police headquarters) defendant initially denied knowing any of the victims' names. T.T., 90–91. However, he later stated to Detective Lenz that the first person he shot was "Mr. Olinger he's supposed to be." T.T. 93. Finally, defendant never protested at being charged with and processed for criminal homicide, despite the fact that (according to the defense theory) the killings were done in the context of his psychotic delusion that he was repelling an enemy attack. All of these facts are inconsistent with the defense's theory that defendant did not understand the nature and quality of his acts, or if he did, that he did not know they were wrong. (Slip Op. at 4–5)

will not disturb this finding as such a course would constitute both a blatant abuse of discretion and an arrogant derogation of the function of the jury, which is the cornerstone of our legal system.

 Appellant next contends that the trial court erred in permitting the prosecution to cross-examine the expert psychiatric witnesses concerning the possible length of appellant's involuntary commitment in the event of his acquittal by reason of insanity. While we agree that certain portions of the prosecution's questioning and comments appear suspect at first blush,[5] when it is viewed in the context of the insanity defense, with a particular view to the evidence presented and the reasonable inferences drawn therefrom, it becomes clear that appellant suffered no prejudice. *See Commonwealth v. Carey*, 313 Pa.Super. 20, 31–32, 459 A.2d 389, 394–95 (1983). Since the insanity defense necessarily involves an in-depth exploration of the appellant's mental condition, the prosecution's assault on the defense experts was within the bounds of fair comment and we find no abuse of discretion. *Commonwealth v. Niemetz*, 282 Pa.Super. 431, 422 A.2d 1369 (1981). This is especially evident here, given the overwhelming technical language that permeated the expert testimony and the inability or reluctance of the expert witnesses to render a definitive opinion as to the length of commitment Belmonte would require or to predict his propensity for dangerous conduct. *See* Diamond, *Psychiatric Prediction of Dangerousness*, 123 U.PA.L.REV. 439 (1974).

Further, we note that appellant, during his direct examination of Dr. Eberle, opened the door to this line of questioning when the following exchange occurred:

Q.: Is it your belief that he [Belmonte] is currently in need of continued treatment or hospitalization?

A.: Absolutely.

---

5. Perhaps the most objectionable of the prosecution's questions was, "How is anybody ever going to know the next time Victor Belmonte is going to go boom and explode?" (N.T. 244) An objection was entered by defense counsel and sustained by the trial judge.

Q.: Will this be for an extended period of time?

A.: It would be hard to say, but certainly my opinion is that Victor would require inpatient hospitalization for an extended indefinite period of time.

(N.T. 176).

■ The prosecution, confronted with the defense's expert testimony that appellant was insane and would require lengthy treatment pursued a course of questioning that explored the inconsistencies in the opinions of the three psychiatrists concerning the length of time appellant would be committed. Viewed in this context, such a course of trial strategy was proper, and did not result in any prejudice to the appellant. *Commonwealth v. Anderson*, 501 Pa. 275, 461 A.2d 208 (1983). Moreover, our review of the record discloses that whenever the questioning of the prosecutor began to approach sensitive areas, the trial judge assiduously sustained defense objections or limited the inquiry.[6] Thus, we conclude that the prosecution's conduct simply did not have the unavoidable effect of creating a fixed bias and hostility toward appellant in the minds of the jury.[7]

Additionally, we point out that the jury was instructed properly regarding the possible psychiatric treatment and

6. For example, during the cross-examination of Dr. Eberle, defense counsel objected to or interrupted the prosecution on numerous occasions. (N.T. 202, 206, 210, 216, 219, 225–26, 231, 248) Consequently, the prosecution either adjusted its questioning to the satisfaction of the court and opposing counsel or the court ruled as demanded.

7. The record discloses that the nature of the testimony adduced at trial was so technical and equivocal that it provoked comment and attack by the prosecution. This Court has previously stated "that a prosecutor's remarks fall within the ambit of fair comment if they are supported by the evidence and provided that they contain inferences which are reasonably derived from the evidence." *Commonwealth v. Barren*, 501 Pa. 493, 498, 462 A.2d 233, 235 (1983). *See also Commonwealth v. Nutter*, 256 Pa.Super. 111, 389 A.2d 626 (1978). A review of the appellate decisions of this Commonwealth which have held that the prosecution has transgressed the bounds of propriety demonstrates that the conduct of the prosecutor in the present case fell within those boundaries. *See, e.g., Commonwealth v. Gilman*, 470 Pa. 179, 368 A.2d 253 (1977); *Commonwealth v. Long*, 258 Pa.Super. 312, 392 A.2d 810 (1978).

commitment of appellant as a consequence of returning a verdict of not guilty by reason of insanity. *Commonwealth v. Mulgrew*, 475 Pa. 271, 380 A.2d 349 (1977). In *Mulgrew*, our Supreme Court held that a jury must be given an explanation of what would be the consequences of a verdict of not guilty by reason of insanity. The *Mulgrew* Court adopted as its rationale the language of *Lyles v. United States*, 254 F.2d 725, 728 (D.C.Cir.1957), *cert. denied*, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), *cert. denied*, 362 U.S. 943, 80 S.Ct. 809, 4 L.Ed.2d 771 (1960), *cert. denied*, 368 U.S. 992, 82 S.Ct. 610, 7 L.Ed.2d 529 (1962), which held:

> The issue of insanity having been fairly raised, the jury may return one of three verdicts, guilty, not guilty, or not guilty by reason of insanity. Jurors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty.... *But a verdict of not guilty by reason of insanity has no such commonly understood meaning.... It means neither freedom nor punishment. It means the accused will be confined in a hospital for the mentally ill until the superintendent of such hospital certifies, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others. We think the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts.* (Emphasis added)

*Commonwealth v. Mulgrew, supra*, 475 Pa. at 275–76, 380 A.2d at 351. *See Commonwealth v. Miller*, 290 Pa.Super. 553, 434 A.2d 1282 (1982) (applying *Mulgrew* ). *See also Commonwealth v. Mutina*, 366 Mass. 810, 323 N.E.2d 294 (1975) (quoted in *Mulgrew* ).

The instruction advocated in *Mulgrew* is incorporated into the draft of the Pennsylvania Standard Jury Instructions on the Insanity Defense. Based on certain provisions of the Pennsylvania Mental Health Procedures Act, 50 Pa.S. § 7101 *et seq.*, this instruction reads as follows:

(6) In determining questions of sanity and guilt you really should not concern yourself with what will happen to the defendant if you find him not guilty—whether he will be set free or whether he will be confined to a mental hospital for treatment. You should apply the law that I give you to decide the case and assume that, whatever your verdict, the authorities will make a wise disposition of the defendant. I will tell you, however, that when a defendant is found not guilty as a result of insanity, he may be the subject of an immediate court proceeding to commit him to a mental treatment facility and, if committed, his commitment will continue until he is no longer dangerous to others or to himself.

Section 5.01A. Revised Instruction Subcommittee Draft, February 2, 1978. "The purpose of this instruction is not only to prevent possible unwarranted convictions but to alleviate any fears that the jury may have that a defendant may be turned loose." *Commonwealth v. Musolino*, 320 Pa.Super. 425, 442, 467 A.2d 605, 614 (1983).

■ In the instant case, the lower court read the above *Mulgrew* instruction verbatim to the jury. (N.T. 500–01). We conclude that this instruction cured any misconception that arose from either counsel's conduct during trial or closing arguments. Based on the above reasoning, we will not disturb the trial court's determination as it is a far superior monitor of the propriety of the prosecutor's remarks than this far removed appellate court. *Commonwealth v. Williams*, 295 Pa.Super. 369, 379, 441 A.2d 1277, 1282 (1982).

■ We expressly reject appellant's assertion that *Commonwealth v. McCann*, 503 Pa. 190, 469 A.2d 126 (1983) sheds no light on the issue before us since it only dealt with a claim of ineffective assistance of counsel. In *McCann*, the reasonable basis for defense counsel's decision not to request a *Mulgrew* charge, which his client was entitled to, was his apprehension that if he did so, the prosecutor would have been afforded an opportunity to argue to the jury that the procedures provided in the Mental Health Procedures

Act would permit the defendant to be released within a relatively short period of time. *McCann, supra,* 503 Pa. at 198, 469 A.2d at 130. If such closing argument is permissible, then it follows by implication that the prosecutor should be able to lay the evidentiary foundation for it by the pertinent cross-examination of the appellant's expert psychiatric witnesses. While the *McCann* Court stopped short of defining the extent of permissible argument by a prosecutor regarding the possible length of commitment, it commented favorably on the fact that other jurisdictions permit explanation of the relevant commitment procedures:

> Since *Mulgrew, supra,* we have not expressly defined the extent to which a prosecutor may argue the possible length of commitment of a defendant found not guilty by reason of insanity. However, other jurisdictions which have addressed this problem have allowed [the] prosecutor to at least explain the procedures by which a defendant would be evaluated. *See State v. Karstetter,* 110 Ariz. 539, 521 P.2d 626 (1974); *People v. Fox,* 131 Ill. App.2d 604, 264 N.E.2d 502 (1970); *People v. Blake,* 58 Mich.App. 685, 228 N.W.2d 519 (1975); *People v. Reade,* 1 N.Y.2d 459, 154 N.Y.S.2d 27, 136 N.E.2d 497 (1956). *See also, Commonwealth v. Killelea,* 370 Mass. 638, 351 N.E.2d 509 (1976). Thus, it was reasonable for trial counsel in this case to conclude that the Commonwealth would have been entitled to at least an instruction on this issue, if not an opportunity to argue the point.

*Id.,* 503 Pa. at 198 n. 5, 469 A.2d at 130 n. 5. We find this reasoning conclusive and hold that appellant's assertion that the prosecution's comments during its closing argument were improper is without merit as it constituted fair argument within the parameters of *Mulgrew.*

▉ Appellant also contends that the prosecution's cross-examination of Dr. Refus using the evaluation of Dr. Shoflin, a member of the treatment team at Fairview State Hospital, constitutes reversible error as it was hearsay and Dr. Refus was neither the writer nor custodian of the report. We disagree and note that an out-of-court state-

ment offered for a purpose apart from the truth of its contents, or to explain a course of conduct is not hearsay. *Commonwealth v. Cruz*, 489 Pa. 559, 565, 414 A.2d 1032, 1035 (1980); *Commonwealth v. Tselepis*, 198 Pa.Super. 449, 181 A.2d 710 (1962). Here, the clinical accuracy of Dr. Shoflin's observations was not at issue; in fact, such a contention would be absurd since Dr. Refus stated that he fully agreed with Dr. Shoflin's report. The prosecution, concerned only with the fact that the statements were made and that Dr. Shoflin agreed with them, pursued this line of inquiry only to demonstrate the inconsistency and malleability of the expert psychiatric testimony presented, and in no way violated those protections engendered in the hearsay rule. *Cf. Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Consequently, we conclude that the prosecution's reference to Dr. Shoflin's psychiatric evaluation and the use of this information as the basis for a hypothetical question did not result in any prejudice to appellant.

The next argument raised by appellant is that the lower court erred in allowing references to be made by the prosecution during cross-examination and in closing argument concerning the appellant's failure to protest his arrest. At the outset, we note that it is reversible error to admit evidence of a defendant's silence at the time of arrest. *Commonwealth v. Greco*, 465 Pa. 400, 350 A.2d 826 (1976). Further, the United States Supreme Court has held that testimony regarding an accused's post-arrest silence is generally inadmissible; *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Here, however, appellant did not invoke his fifth amendment privilege to remain silent and a contextual reading of the prosecution's questions and comments reveals no such violation. In fact, appellant made a knowing and informed waiver of his *Miranda* rights both at the state police barracks in Carnegie, Pennsylvania, and while in custody of the Allegheny County police. Further, all of the cases which appellant relies on can be distinguished as they involve situations where the accused

has invoked his fifth amendment privilege. *See, e.g., Commonwealth v. Turner*, 499 Pa. 579, 454 A.2d 537 (1982); *Commonwealth v. Singletary*, 478 Pa. 610, 387 A.2d 656 (1978). *See also Commonwealth v. Easley*, 483 Pa. 337, 396 A.2d 1198 (1979); *Commonwealth v. Haideman*, 449 Pa. 367, 296 A.2d 765 (1972).

In the instant case, the exchange alleged as error by the appellant was part .of the cross-examination of Dr. Melnick. (N.T. 401–06). However, we find that the challenged remarks, when viewed in the context of appellant's insanity defense, did not constitute an error of constitutional magnitude. Moreover, appellant's "lack of protest" during and following his arrest was explored by the Commonwealth not in terms of "silence", but was directed at assaulting the credibility of appellant's insanity defense (i.e., Was appellant's conduct normal in light of the fact that he was arrested and charged with four counts of criminal homicide?). *Cf. Commonwealth v. Hassine*, 340 Pa.Super. 318, 490 A.2d 438 (1985) (prosecution elicited testimony designed to rebut defendant's allegation that he cooperated with the police, not to suggest his guilt to the jury). As such, we conclude that the prosecution's references were within the ambit of fair argument. *Commonwealth v. Barren*, 501 Pa. 493, 462 A.2d 233 (1983).

In addition, appellate counsel, Paul D. Boas, Esquire, who also served as trial counsel, raises his own ineffectiveness concerning his failure to object to the prosecution's reference to appellant's "lack of protest" during his arrest. We would note that counsel did make this objection during cross-examination, and as we have already disposed of this issue on the merits, we need not address appellant's alternative claim of ineffective assistance of counsel. We note that the instant case is totally inapposite from *Commonwealth v. Serianni*, 337 Pa.Super. 309, 486 A.2d 1349 (1984), which held that where counsel argues his own ineffectiveness, unless reversible error is apparent from the record, the case must be remanded for the appointment of new, independent counsel. In *Serianni*, however, neither

claim connected with counsel's ineffectiveness was addressed on the merits by the lower court due to counsel's failure to preserve them in post-verdict motions. Pa.R. Crim.P. 1123. Here, unlike the situation in *Serianni*, appellant's claim of ineffective assistance of counsel is raised in the *alternative*. Since appellant has argued and briefed the issue pertaining to his "lack of protest" during arrest, and we have disposed of it on the merits, appellant's alternative claim that counsel was ineffective for failing to object to the prosecution's remarks in its closing argument is moot.

█ Appellant's next argument is that the trial court erred in refusing to grant appellant's request for a jury instruction on character evidence. We begin our analysis by noting that a defendant who produces character testimony of a good reputation in the community is entitled to a jury charge that character evidence alone may be sufficient to raise a reasonable doubt and, thus, justify an acquittal of the charges. *Commonwealth v. Scott*, 496 Pa. 188, 436 A.2d 607 (1981); *Commonwealth v. Schultz*, 335 Pa.Super. 306, 484 A.2d 146 (1984).

In the instant case, appellant contends that two of his witnesses, Sgt. Curtiss Tipton of the United States Army and Gary Pignale, a long time friend, who were called to testify regarding the substantive defense of insanity (i.e., their knowledge of appellant's background), were also used as character witnesses. We disagree.

When counsel for appellant submitted his requested points for charge, a charge on character testimony was specifically requested (N.T. 479–81). The prosecution objected to such a charge, and the lower court agreed, stating that the witnesses were not asked about Belmonte's "reputation." We agree with the lower court's determination for the following reasons.

█ Initially, we note the trial court held that a proper foundation for character evidence was not laid since the witnesses were not asked the proper qualifying questions.

(Slip Op. at 8–10). We need not elaborate on this point since our review of the record leads us to conclude that the testimony now advanced as reputation evidence was not in fact, nor in effect, reputation evidence that required an expansive character charge. Rather, we find under the facts and circumstances of this case that such evidence was an integral part of a skillful, albeit unsuccessful, effort to establish appellant's insanity. As such, it should not be viewed as providing the basis for a separate instruction on character evidence. The portions of Sgt. Tipton's and Pignale's testimony which appellant argues should be treated as character evidence fit into the gestalt of appellant's defense scheme and cannot be isolated from either the totality of the above-mentioned witnesses' testimony or the testimony of the expert witnesses appellant presented in support of his insanity defense. Viewed in this context, we conclude that the lower court's refusal to charge the jury on character evidence was proper in light of the facts and evidence present in the instant case.

Our conclusion is buttressed by the fact that appellant, whose sole defense was insanity, admitted the fact that he committed the offenses charged. Therefore, the essence of appellant's defense negates the need for character evidence since the premise underlying the admissibility of reputation evidence is that it tends to show the improbability of the accused's doing the act charged. *See Wigmore, Evidence* § 56 (3d.Ed.1940). The cases which appellant cites for the proposition that failure to instruct the jury on character evidence alone results in reversible error all deal with situations where: (1) the appellant has testified; and (2) his credibility is at issue. Here, appellant relied solely on the defense of insanity. He chose not to testify and therefore he did not place his credibility into question. Moreover, appellant's argument that the purported testimony is reputation evidence is belied by the remarks of defense counsel during his summation to the jury. During his closing, appellant's counsel extensively reviewed the testimony of the defense experts, and integrated into that the testimony

of the lay witnesses in order to summarize the development of appellant's mental illness and its tragic manifestation in the resultant shootings. At no time did appellant's counsel refer to the testimony of Tipton and Pignale for its worth as reputation evidence. Based on all of the above reasons, we conclude that the lower court acted properly in refusing to instruct the jury on character evidence.[8]

Finally, appellant contends that the trial court, in charging the jury, committed reversible error by mistating the burden of proof on the critical element of insanity.[9] The Opinion of the trial court noted that:

> during its charge to the jury the words "or" and "incapable" were, in fact, used where the words "and" and "capable" appear in the transcript. This inference is drawn for these reasons: (1) the court's charge was read directly from cards containing the correct words, which cards were prepared directly from Pa.SSJI (Crim.); (2) There are many other minor discrepancies between the court's charge cards and the charge as transcribed; and (3) although both attorneys were listening closely enough to the charge to point out that the court had inadvertently used the phrase "guilty by reason of insanity" at one

8. The Commonwealth maintains that because defense counsel failed to object to the absence of an instruction on character evidence at the close of the trial court's charge, this claim is waived under *Commonwealth v. Rineer*, 310 Pa.Super. 241, 456 A.2d 591 (1983) (requiring a specific objection *after* the charge is read to the jury in order to preserve an issue, even where the jury instructions have been timely offered and refused). *See also Commonwealth v. Russell*, 326 Pa.Super. 346, 473 A.2d 1383 (1984) (citing *Rineer*). We reject the Commonwealth's waiver argument because at the time of appellant's trial, the law was unsettled regarding whether Pa.R.Crim.P. 1119(b) required an objection both at the time a requested point for charge was denied and after the ultimate charge is read to the jury. *Rineer, supra,* 310 Pa.Super. at 248–49, 456 A.2d at 594–95. Since appellant was tried prior to *Rineer's* pronouncement that an objection must be made after the charge is read to the jury, we hold that it would be unfair to find this claim to have been waived, especially in light of the conflicting case law which existed at the time of the alleged error.

9. The Commonwealth contends that this claim has been waived since defense counsel failed to specifically object to the court's charge on the legal definition of insanity. We decline to find waiver here for the same reasons stated in note 8.

point in the charge (T.T. 508–09), neither attorney heard the court say "and" when "or" should have been used or "capable" when "incapable" should have been used. (footnote omitted)

Slip Op. at 19–20.

 We agree with the reasoning of the lower court since the record in the instant case was repleat with transcriptional error. Here, our review of the record convinces us that the correct charge was given but merely was transcribed incorrectly.

In making this determination, we need not depend on facts outside the record and, therefore, the cases relied on by appellant for his proposition that the trial court committed reversible error can be distinguished from the situation before us. *See, e.g., Commonwealth v. Thomas*, 465 Pa. 442, 350 A.2d 847 (1976); *Commonwealth v. Young*, 456 Pa. 102, 317 A.2d 258 (1974). In *Young*, defense counsel requested a proper instruction on reasonable doubt and objected to the trial court's resulting charge, thereby directing the court's attention to the defense's rejected points for charge. *Id.*, 456 Pa. at 108–09, 317 A.2d at 261. At best, the *Young* Court was confronted with much more than mere transcriptional error.[10] Moreover, this Court has previously refused to apply the rule in *Young* in a mechanical fashion. *See Commonwealth v. Boettcher*, 313 Pa.Super. 194, 459 A.2d 806 (1983); *Commonwealth v. Nelson*, 311 Pa.Super. 1, 456 A.2d 1383 (1983).[11] Given the leeway

**10.** It is well settled that the courts have the power to correct clerical errors in the record. *Commonwealth v. Claudy*, 378 Pa. 429, 106 A.2d 401 (1954); *Commonwealth v. McDonald*, 285 Pa.Super. 534, 428 A.2d 174 (1981).

**11.** We note that Pa.R.A.P. 1922 and 1926 provide a procedure for the correction or modification of the record. However, neither section provides a penalty for failure to comply with the provisions therein. Further, those appellate decisions which have reversed the lower court for violations of the procedural rules have presented factual situations inapposite from the instant case. *See, e.g., Commonwealth v. Brown*, 496 Pa. 86, 436 A.2d 165 (1981); *Commonwealth v. Young*, 456 Pa. 102, 317 A.2d 258 (1974). Therefore, we conclude that the trial court's failure to technically comply with the procedural rules is not fatal to its subsequent finding that no error occurred.

24

provided for in the above-cited case law, the numerous other discrepancies between the standardized charge cards and the charge as transcribed, and the lack of objection from counsel who had previously objected during the same charge, we conclude that appellant's claim should be dismissed. After carefully reviewing the entire record, including the disputed charge on the legal definition of insanity, as this Court is bound to do, see *Commonwealth v. Jones*, 300 Pa.Super. 338, 446 A.2d 644 (1982), we hold that the trial judge gave a proper and adequate charge regarding the Commonwealth's burden to prove its case beyond a reasonable doubt.[12]

Accordingly, the judgment of sentence is affirmed.

ROBERTS, J., concurs in the result.

BROSKY, J., dissents.

BROSKY, Judge, dissenting:

I dissent. I would hold that there was an insufficiency of evidence with regard to appellant's sanity.

12. The dissent does not point to any specific factual inadequacies or legal infirmities for its conclusion that the evidence, as to defendant's insanity, was insufficient, but simply attempts to substitute his subjective view of how the evidence should have been received by the jury. Admittedly, the crimes in this case are horrendous and overwhelming, but the carefully tried case and well reasoned charge to the jury, governed by applicable law, assures that the jury could properly distinguish between emotionalism and its fact finding duty. It is just this emotionalism, which causes juries to acquit rather than convict when the facts and law would dictate otherwise, that resulted in the legislature enacting the Guilty But Mentally Ill provision to the Crimes Code, 18 Pa.C.S.A. § 314 and Sentencing Code, 42 Pa.C.S.A. § 9727 (not applicable here), relieving the jury of the unpalatable choice. We may not usurp the function of the jury under these circumstances and must affirm. To do otherwise, would be to turn the concept of appellate review into an exercise in sociological revisionism, in which we substitute our distaste for the rigidity of the M'Naghten rule, for the law and do precisely that which we would condemn if done by the trial court.

As our Opinion illustrates and documents, we have reviewed this record minutely and exhaustively; we have researched the law in every direction the appellant would lead us. Our conclusion, even if painful, is inescapable. We do not subscribe to the inherent bias in judges (including appellate judges) and incapacity to decide hard cases inferred by the dissent in his footnote 1.

The transcript of the trial has been reviewed in its entirety repeatedly over a protracted period of time. The same conclusion resulted on each reading: the jury could not have properly found that the appellant was sane at the time the crimes in question were committed. Neither the evidence alone, nor that evidence together with the inferences which could reasonably be drawn from it, substantiate such a verdict.

The evidence has been accurately summarized by the majority. The testimony which it synopsizes presents a tragic event. The horror for the victims and their families and the grotesque depths of appellant's delusion were painful to read and re-read.

This is not often true on an appellate court. The steady parade of human savagery which is presented to us has an inuring effect. Notwithstanding this, the case before us had a special impact.

This strong personal reaction to these events is, of course, quite irrelevant to the judicial function to be performed. It is due to the necessity to disregard this subjective response that the record was reviewed so often and at intervals. For the question is not what the appellate judge would have done had he been a juror in the case. Rather, the question is—with extreme deference to the fact finder—whether the verdict of the fact finder was supported by the evidence. Applying this standard most rigorously, I have come to my stated position.

In doing so, I have been mindful of the need to approach most circumspectly the fact finder's conclusion. However, it is equally important to remember that a restricted scope of appellate review must never become synonymous with no review at all.[1] The review function must be exercised to

1. Of course, in no way do I mean to imply that my brother judges on this panel have not also subjected this case to the most careful scrutiny. Indeed, I am confident that quite the opposite is true. I am merely pointing out that an issue type which is frequently a losing one for appellants due to its restricted scope of review, can acquire in a judge's mind an almost irrebuttable presumption of failure. This is

appellant's benefit when the occasion requires it. Otherwise, we have issues and rights which exist in form but never in fact. This duty of active, actual review coexists in a state of functional tension with the duty to apply a restricted scope of review. Both are essential to the process.

In this type of case it is all too easy to understand how this error could come about. The jury is faced with a horrific and senseless act. They are mindful of stories in the media of persons found not guilty because they are insane who are subsequently released from mental institutions and then commit another demented criminal act. They are reminded by the prosecutor's questioning that no one can confidently predict when the appellant "is going to go boom and explode." Little wonder that a jury may decide to "play it safe" and find one like the appellant guilty.

But, where a jury may derogate its legal duty by doing what it sees as its social duty, the appellate courts cannot so indulge themselves. Our stern duty must be met. Here that duty dictates, as I see it, that the evidence be found insufficient. While respecting those who have come to the opposite conclusion, for myself, I find any other conclusion inconceivable.

If any case ever detailed the actions of an insane mind, surely that case is before this Court today.

an occupational hazard which, I think, all judges should, and most judges do, acknowledge.