393 A.2d 837

**COMMONWEALTH of Pennsylvania**

**v.**

**Bruce NORMAN, an Individual, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 10, 1976.

Decided Oct. 20, 1978.

302

Sharon K. Wallis, Philadelphia, for appellant.

Steven H. Goldblatt and Deborah E. Glass, Assistant District Attorneys, and F. Emmett Fitzpatrick, District Attorney, Philadelphia, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PER CURIAM:

The six Judges who decided this appeal being equally divided, the judgment of sentence is affirmed.

CERCONE, J., files an opinion in support of affirmance in which PRICE and VAN der VOORT, JJ., join.

HOFFMAN, J., files an opinion in support of reversal in which JACOBS, President Judge, and SPAETH, J., join.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

The above case was decided prior to the retirement of HOFFMAN, J.

## OPINION IN SUPPORT OF AFFIRMANCE

CERCONE, Judge:

This is an appeal from a judgment of sentence of the Court of Common Pleas of Philadelphia County, Criminal Trial Division. Appellant was convicted, after a non-jury trial, of simple assault, aggravated assault, possession of an instrument of crime, possession of a prohibited offensive weapon, resisting arrest, and recklessly endangering another person. He received two years' psychiatric probation. The sole issue on this appeal is whether appellant's sanity was proved beyond a reasonable doubt. I conclude that it was.

The facts of the criminal episode are summarized as follows in the opinion of the court below.

"[O]n May 19, 1974 at 3:20 A.M. the defendant was lying in the street on the Northwest corner of 42nd & Ludlow Streets, Philadelphia, Pa. clad in only pants and tee shirt. Acting upon information received, two police officers arrived at the scene and thinking the defendant intoxicated, attempted to arouse him. At first there was no response from the defendant. However, within a matter of seconds the defendant leaped to his feet wielding a long automobile bumper jack which had been concealed beneath him. The defendant swung the jack at one of the officers who

drew his revolver and told the defendant to drop the jack, that he was under arrest. Meanwhile, the other officer was on the radio calling for assistance. The defendant then ran down the street and into a house at 12 So. 42nd Street, pursued closely by the officers. The officers followed the defendant into the dining room and again told him to drop the jack. The defendant was wide eyed and unresponsive. Within minutes approximately 6 more officers arrived. Defendant moved into the unlit kitchen standing with his back to the wall poised with the bumper jack in his hands. The officers were congregated in the doorway of the kitchen and one of them turned on the light. At that time the defendant was about 5 ft. from the officers when he suddenly screamed loudly and lunged at the officers with the jack raised in a swinging gesture. Fearing for their safety and lives the officers fired at the defendant. The defendant fell wounded and was then taken to the hospital where he eventually recovered from his injuries."

Appellant presented psychiatric testimony, discussed *infra*, to support his contention of insanity.

The test for insanity was described in *Commonwealth v. Demmitt,* 456 Pa. 475, 481, 483, 321 A.2d 627, 631, 632 (1975):

"The law in Pennsylvania is still the *M'Naghten* test. It is not intended to separate the emotionally disturbed defendants from the emotionally healthy. Rather, it is intended to include defendants, both disturbed and healthy, among those who are held criminally responsible. For it to appear that defendant is not sane the evidence must meet one of the two parts of the *M'Naghten* test; that is, at the time he committed the act, either he did not know the nature and quality of the act or he did not know that it was wrong.

. . . . There must be evidence in the case from whatever source that he did not know the nature and quality of his act or that he did not know that it was wrong. When he offers evidence of that insanity, the Commonwealth can no longer rely upon a presumption of

sanity but instead must offer evidence to show that he was sane."

*Demmitt* must be read together with *Commonwealth v. Whitfield,* 475 Pa. 297, 380 A.2d 362, 364–65 (1977); there the court said:

" . . . [O]ur standard of review is a limited one. Psychiatric testimony, like any other evidence, is for the trier of fact to consider and to determine what weight it should be given."

██ In light of *Whitfield* and the innumerable cases supporting the factfinding discretion of trial courts, I am of the opinion that the court below had the right to decide, as it apparently did, that appellant's bizarre behavior did not reflect the mental condition described in *Demmitt.* The fact that a person is in an emotionally agitated condition and acts irrationally while breaking the law, without more, reveals little about his perception of his actions and of their rightness or wrongness. The testimony that appellant was "acting crazy" was not conclusive as to whether he *was* crazy. To hold otherwise would be to offer every actor with a modicum of acting ability an opportunity to escape criminal responsibility.

██ As to the psychiatric testimony, whether it was sufficient to place appellant's sanity in issue was likewise for the trial court to decide. I believe that the court below was well within its discretion in not accepting the psychiatrist's conclusions. A perfunctory recitation by a psychiatrist that a defendant's mental state fits the *M'Naghten* criteria, in my view, may be discounted when the facts on which this conclusion is based fail to support it. Instantly, the factual underpinnings of the psychiatrist's conclusion were that appellant (according to his responses in an interview) had been rejected by people close to him, had consequently been so desperate for sympathetic attention that he was willing to suffer bodily harm to get it, and chose provoking the police officers to shoot him as the way to accomplish this goal. This testimony suggests that appellant's behavior was a rational means to an irrational end and not a manifesta-

tion of legal insanity. Appellant's realization that his conduct would necessitate drastic defensive action on the part of the police officers is evidence that he knew the nature and quality of his act and knew it was wrong. Furthermore, the fact that mental disturbance provides the *motive* for criminal conduct does not, by itself, entitle the perpetrator to an acquittal on the basis of insanity, at least in Pennsylvania. Examination of the motive for a crime will rarely reveal that the perpetrator is in the best of mental health. Compare *Demmitt,* supra, 456 Pa., at 477, 321 A.2d at 629, where the court quoted appellant's explanation of his conduct (shooting and killing a co-worker):

" . . . I do silly, stupid, crazy things from time to time, and this is the worst thing that I've ever done, of course. And I really do need help. I know I'm mentally ill, and I tried telling people this so I could get committed but no one would commit me. So now they have to. Someone's got to help."

The *Demmitt* court took this statement as evidence of *sanity.* As the psychiatric conclusion of insanity in the instant case was based on a similar explanation, the court below was justified in rejecting it.

■ What appellant's unenviable mental condition entitled him to was special consideration at sentencing. This he received. As noted *supra,* he was sentenced to two years of psychiatric probation, which will hopefully satisfy the need for attention that brought about the tragic episode from which the charges arose.

Judgment of sentence affirmed.

PRICE and VAN der VOORT, JJ., join in this opinion.

### OPINION IN SUPPORT OF REVERSAL

HOFFMAN, Judge:

Appellant contends that the Commonwealth failed to produce sufficient evidence to prove his sanity beyond a reasonable doubt. I agree. Accordingly, I would reverse the

judgments of sentence and remand for proceedings consistent with this opinion.

On February 13 and 14, 1975, appellant was tried without a jury in the Philadelphia County Court of Common Pleas on three counts of simple assault,[1] three counts of aggravated assault,[2] possession of an instrument of crime generally,[3] possession of a prohibited offensive weapon,[4] resisting arrest,[5] and recklessly endangering another person.[6] The Commonwealth produced the following testimony. Officer Patrick Gaegan testified that at 3:20 a. m., on May 20, 1974, he received a car radio report of a man lying in the road at 42nd and Ludlow Streets in Philadelphia. Upon arriving at this location, Officer Gaegan met another police officer, Joseph Ingenito, and found appellant prostrate in the street, apparently unconscious, but not intoxicated. Officer Gaegan approached appellant and attempted to arouse him; his efforts failed. As the police officer started to back away, appellant suddenly jumped up, pulled a car bumper jack from between his legs, and flailed at the officer. Officer Gaegan immediately pulled his revolver, and appellant retreated to a brick wall adjoining Ludlow Street. Officer Gaegan then ordered appellant to drop the bumper jack and informed him that he was under arrest. Appellant did not react at all to these statements. Instead, appellant stared "wide-eyed" at Officer Gaegan, and his head shook. According to the police officer, appellant did not appear "normal." While Officer Gaegan did not believe that appellant had just experienced an epileptic seizure, he could not rule out the possibility that appellant was "acting crazy."

1. The Crimes Code, Act of Dec. 6, 1972, P.L. 1482, eff. June 6, 1973, 18 Pa.C.S. § 2701.

2. The Crimes Code, supra; 18 Pa.C.S. § 2702.

3. The Crimes Code, supra; 18 Pa.C.S. § 907(a).

4. The Crimes Code, supra; 18 Pa.C.S. § 908.

5. The Crimes Code, supra; 18 Pa.C.S. § 5104.

6. The Crimes Code, supra; 18 Pa.C.S. § 2705.

Confronted with appellant's refusal to submit peaceably, Officer Gaegan decided to call for the assistance of other police officers. As he proceeded towards his patrol car, he observed appellant attempt to strike Officer Ingenito with the bumper jack. Appellant then fled east on Ludlow Street, then north on 42nd Street until he reached his residence at 12 S. 42nd Street. Both police officers followed appellant into his house.

Once inside his house, appellant ran into his dining room and positioned himself, bumper jack still in hand, near a window on the far wall. From a distance of 7–8 feet, Officer Gaegan again entreated appellant to relinquish the jack and assured him that the police officers would not hurt him. Appellant did not respond.

Upon hearing the sound of police car sirens, Officer Ingenito went outside in order to direct the newly arrived police officers to the scene of the confrontation. As soon as Officer Ingenito departed appellant retreated into his unilluminated kitchen and stationed himself against the far wall. While standing in the doorway of the kitchen, about 6 feet from appellant, Officer Gaegan was joined by three other police officers, Ingenito, William Farrell, and Calvin James. The police officers pointed their guns at appellant. Renewed attempts at communication failed; appellant continued to stare with wide-open eyes at the police officers, and his head continued to shake. Officer Farrell then switched on the kitchen light; this action elicited a "blood-curdling" scream from appellant who simultaneously lunged towards the police while swinging the bumper jack. In response, the police officers fired a volley of shots. Appellant slumped to the ground unconscious. The police officers subsequently disarmed him and transported him to a nearby hospital.

Officer Ingenito corroborated all material aspects of Officer Gaegan's testimony. In particular, he testified that appellant stared at the police officers in a "wide-eyed" and very nervous fashion which was not normal, and that his actions were not rational.

Officer Farrell testified that he observed appellant's demeanor and actions before and during the attack in the kitchen. He gave the following description:

"Well, at that time, for a split second, he seemed okay, and then as the light came on he started, his eyes got much larger, breathing got much deeper and faster, and, I don't know, it appeared to me that he started sweating, but he could have been sweating already, you know. And he started getting pretty wild eyed. Then he screamed, and raised the bumper jack from over his shoulder to over his head and started towards us. When he was, when he started breathing heavy, and, in what I would consider a demented fashion I unsnapped the restraining strap to my gun, and as he started towards us, with the bumper jack, I pulled my gun and fired my revolver twice." Officer Farrell concluded that appellant's actions and appearance during this incident definitely manifested an irrational attitude. To support this impression, Officer Farrell stressed the irrational nature of appellant's doomed attack on a superior number of police officers who had their guns trained on him.

Officer Calvin James completed the Commonwealth's testimony. Based upon his observation of appellant in the kitchen, Officer James recollected that appellant's facial expression, his features, and his general composure were all "wild."

Mrs. Ethel Norman, appellant's mother, testified that her son, 23 at the time of trial, had a normal and very active childhood. In high school, he suffered epileptic seizures and often complained of severe pain in his head. After treatment at Philadelphia General Hospital for these problems, he would appear strange, although his mother thought he acted normally.[7] Appellant's mother also testified that she saw her son in a candy store on the morning of May 19, 1974, the day before appellant's encounter with the police. At that time, appellant appeared normal.

---

7. Appellant's grandmother confirmed this account of appellant's childhood medical problems and added that after a seizure, appellant would appear drowsy and would not talk much.

Doctor Denis P. Koson, a forensic psychiatrist at the University of Pennsylvania, completed the case for the defense. Based on an interview with appellant, his reading of the preliminary hearing transcript, and his review of another psychiatrist's report in the court clinic records, Dr. Koson concluded that appellant " . . . at the time of the event in question . . . was not criminally responsible, that is, he was by reason of mental illness unable to understand the nature and quality of his act, or, if he did, to know it was wrong." According to Dr. Koson, appellant suffered a series of painful rejections by relatives and a girlfriend immediately prior to the May 19, 1974 incident. As a result of these rejections, appellant had an intense desire to cause serious damage to his person. Appellant hoped to create a major incident which would bring his plight to the attention of his family or the authorities. Because of this desperate wish to manufacture a situation which could result in serious harm to himself, appellant initiated the confrontation with the police. Because appellant could only concentrate upon provoking the police officers to the point of injury, he lacked the capacity to reflect seriously on the option of peaceful submission to the police and to consider the rightness or wrongness of his actions or even the foolhardiness of an escape attempt when cornered by police officers with drawn guns. According to Dr. Koson, appellant's actions indicated a disassociative reaction, a state of psychiatric disturbance.

At the conclusion of the testimony, the lower court found appellant guilty on all charges. The court sentenced appellant to a two year term of probation, conditioned upon appellant's willingness to receive neuro-psychiatric treatment. This appeal followed.

Appellant contends that the Commonwealth failed to produce sufficient evidence to demonstrate his sanity on May 20, 1974, beyond a reasonable doubt. Under the *M'Naghten* test, repeatedly endorsed by Pennsylvania appellate courts, a defendant is legally insane if "at the time of the act, either he did not know the nature and quality of the act or he did not know it was wrong." *Commonwealth v. Bruno,* 466 Pa. 245, 251, 352 A.2d 40, 43 (1976); *Commonwealth v. Hamil-*

*ton,* 459 Pa. 304, 308, 329 A.2d 212, 214 (1974); cert. denied 420 U.S. 981, 95 S.Ct. 1411, 43 L.Ed.2d 663 (1975); *Commonwealth v. Woodhouse,* 401 Pa. 242, 164 A.2d 98 (1960); *Commonwealth v. Mosler,* 4 Pa. 264 (1846). Once a defendant offers some evidence of his insanity which meets the *M'Naghten* test the Commonwealth bears the burden of establishing the defendant's sanity beyond a reasonable doubt. *Commonwealth v. Ernst,* 476 Pa. 102, 381 A.2d 1245 (1977); *Commonwealth v. Whitfield,* 475 Pa. 297, 380 A.2d 362 (1977); *Commonwealth v. Demmitt,* 456 Pa. 475, 321 A.2d 627 (1974). Our courts impose this obligation upon the Commonwealth because " . . . [i]n any criminal prosecution, the Commonwealth has an unshifting burden to prove beyond a reasonable doubt all elements of the crime." *Commonwealth v. Rose,* 457 Pa. 380, 389, 321 A.2d 880, 884 (1974). *See also Commonwealth v. Moyer,* 466 Pa. 464, 468, 353 A.2d 447, 449 (1976). In attempting to meet this burden, the Commonwealth may rely on either expert or lay testimony. *Commonwealth v. Vogel,* 468 Pa. 438, 364 A.2d 274 (1976); *Commonwealth v. Bruno,* supra; *Commonwealth v. Demmitt,* supra; *Commonwealth v. Donofrio,* 247 Pa.Super. 345, 372 A.2d 859 (1977); *Commonwealth v. Ross,* 239 Pa.Super. 94, 361 A.2d 685 (1976); *Commonwealth v. Washington,* 235 Pa.Super. 339, 340 A.2d 896 (1975). As the Supreme Court stated in *Commonwealth v. Demmitt,* "[t]his evidence may come from testimony of [lay] witnesses concerning the defendant's actions, conversations, and statements at the time of the [act in question] from which the jury could find that he knew what he was doing when he [performed the act in question] and knew it was wrong."

Given these guideposts, I must now determine whether the evidence, viewed in the light most favorable to the Commonwealth, supports a finding beyond a reasonable doubt that appellant knew the nature and quality of his acts and knew that they were wrong. *See Commonwealth v. Bruno,* supra. In the instant case, I believe that the Commonwealth's evidence falls far short of establishing appellant's sanity beyond a reasonable doubt. The testimony of appellant's psychiatrist, Dr. Koson, squarely placed appel-

lant's sanity at the time of the May 20, 1974 incident in issue. The testimony of the Commonwealth's lay witnesses supported, rather than contradicted, Dr. Koson's testimony that appellant was incapable of understanding the nature and quality of his actions on May 20, 1974, or appreciating their criminality. For example, Officer Farrell testified that appellant appeared and conducted himself in an irrational, demented fashion. Officer Ingenito testified that appellant did not act rationally and that his mannerisms were not normal. Officer Gaegan asserted that appellant did not appear normal, and he conceded that he could not rule out the possibility that appellant was "acting crazy". Finally, Officer James confirmed the impression of all the other police officers that appellant appeared to be "wild" during the events in appellant's kitchen on May 20, 1974. In sum, the testimony of the four police officers buttressed the opinion of Dr. Koson that appellant, driven by a need to bring attention to himself by lashing out until the police officers injured him, could neither understand the nature and quality of his acts nor recognize their rightness or wrongness. Rather than dispelling any doubts raised by Dr. Koson's testimony, the testimony of the Commonwealth's lay witnesses, raised a reasonable doubt concerning appellant's sanity.[8] Because the Commonwealth failed to meet its burden of proving appellant's sanity beyond a reasonable doubt, I would reverse the judgments of sentence and would remand for entry of a not-guilty verdict by reason of insanity so that proceedings under the Mental Health Procedures Act of 1976, 50 P.S. § 7406 (Supp.1978) may be instituted.

JACOBS, President Judge, and SPAETH, J., join in this opinion.

The decision in this case was made prior to the retirement of HOFFMAN, J.

---

**8.** I attach no significance to the testimony of appellant's mother that she encountered appellant in a candy shop on the morning preceding the incident, and that her son appeared normal at that time. Such an observation at a brief meeting cannot suffice to establish appellant's sanity beyond a reasonable doubt at the much later time of the controverted incident.