504 A.2d 1329

**COMMONWEALTH of Pennsylvania**

v.

**Gerald E. ZIMMERMAN, Appellant.**

Superior Court of Pennsylvania.

Submitted April 3, 1985.

Filed Feb. 20, 1986.

6

Robert A. Longo, Lancaster, for appellant.

Henry S. Kenderdine, Jr., District Attorney, Lancaster, for Com., appellee.

Before CAVANAUGH, OLSZEWSKI and HOFFMAN, JJ.

OLSZEWSKI, Judge:

This appeal follows a judgment of sentence for murder of the first degree. Appellant has made numerous allegations of error. For the reasons that follow, we deem those allegations meritless and affirm the judgment of sentence.

On July 31, 1980, a young girl named Evelyn Fisher disappeared from her home. Her skeletal remains were found October 9, 1980, in the thick brush and foliage of the Welsh Mountains, about four miles from the girl's home.

Appellant was arrested and charged with homicide. Michael J. Perezous was appointed as chief defense counsel. Pre-trial motions were filed and a suppression hearing was

held on February 18, 1981. The lower court ruled that statements made by appellant would be admissible in the subsequent trial. Following a hearing March 20, 1981, appellant was found competent to stand trial. A change of venue was granted to counter the effects of adverse advance publicity. Trial commenced April 27, 1981 in Northampton County.

Commonwealth's theory of the case was that appellant had lured the girl to his house, attacked her, then carried her to a secluded area where he bound her, assaulted her sexually, and left her for dead. In support of that theory, Commonwealth introduced evidence tending to establish that appellant had the motive, the opportunity and the means to commit the crime.[1]

On May 6, 1981, appellant was found guilty of murder of the first degree and sentenced to life imprisonment. On June 2, 1981, appellant filed a *pro se* petition for appointment of new counsel. In it, he alleged ineffectiveness of

1. Commonwealth introduced evidence that appellant was, at the time of Evelyn Fisher's disappearance, separated from his wife. Witnesses testified that Evelyn Fisher bore a strong physical resemblance to appellant's estranged wife. Although trial counsel objected to admission of testimony that appellant was sexually frustrated, Commonwealth argued "He missed all the affection that his wife formerly had given him and he wanted to get some affection from Evelyn Fisher.... A sexual assault. That's it."

To establish means, Commonwealth presented Paul N. Bowman who attested to appellant's proficiency in martial arts. On cross-examination, Bowman explained that the philosophy of martial arts is "extremely defensive" in nature.

Commonwealth's evidence of opportunity consisted of testimony that appellant had called Evelyn Fisher and asked her to clean his house. The girl left to go to appellant's house which was next-door to her parents' home. That was the last she was seen alive.

An elderly woman, who lived between appellant's house and the woods where Evelyn Fisher's body was eventually found, testified that she had seen appellant's car stop by her house that afternoon. In the car, a man turned "and with both fists, started punching someone on the back seat."

Various witnesses testified to appellant's actions later that day. From the testimony, an inference could fairly be drawn that appellant was attempting to establish an alibi for that afternoon.

The defense introduced Ann Woodland, a psychologist who testified that appellant had told her he struck the girl: "He recalls doing that. From then on, Jerry couldn't remember what happened."

trial counsel. New counsel was appointed and the allegations of ineffectiveness were explored more fully in an evidentiary hearing December 11, 1981. Post-verdict motions were filed, argued and denied. This appeal followed.

## I

Appellant argues first that the lower court erred in failing to suppress statements made by him to the police during the night following Evelyn Fisher's disappearance. The thrust of these statements was that appellant had indicated a "possibility" that he could have harmed the Fisher girl. Appellant, at the time he gave the statements, was contemplating taking his own life or running away. He now contends that in light of his mental condition at that time, the statements could not have been voluntary. In the alternative, he argues that the statements must be suppressed because the police had failed to advise him of his *Miranda* rights.[2] We disagree.

The lower court made extensive findings of fact:

On the evening of July 31, 1980, Trooper Raymond Solt of the Pennsylvania State Police received a radio transmission to assist the Upper Leacock Township Police in a "possible hostage situation" taking place in Leola. At the time he received the radio transmission, Trooper Solt knew nothing of the disappearance of Evelyn Fisher.

Pursuant to the radio transmission, he went to the Leola Fire Company building and sometime between 11:00 p.m. and midnight of July 31, 1980, conferred with various Township police officers and other people, including defendant's sister, Deborah Kieffer and her husband Eugene Kieffer. The purpose of this conference was to inform Trooper Solt about the actions of the defendant,

---

**2.** Extending the argument, appellant contends that his sister had effectively acted as an agent of the police and so any statements made to her during his stay in the psychiatric unit of St. Joseph's Hospital must also be suppressed. Appellant has failed to develop this argument. We deemed it waived. *See* Pa.R.A.P., Rule 2119, 42 Pa.C.S.A.. Further, we note that the court found as fact that Deborah Kieffer, appellant's sister, was never asked to work for the police nor was she asked to obtain information for them.

who was at that time in his apartment at 73–B Main Street, Leola, which was a couple blocks away from the fire company. There were no flashing lights or sirens used by police vehicles as they arrived at the fire company.

As a result of his conversation at the fire company, Trooper Solt learned for the first time that Evelyn Fisher was missing from her home in New Holland and that the defendant had seen her on that day (July 31, 1980). In addition he also learned from Deborah Kieffer that the defendant had some mental problems and that there was a loaded rifle in defendant's apartment.

It was ultimately decided that an attempt should be made to check out the defendant's apartment. Thus at about 12:40 a.m. on August 1, 1980, Trooper Solt together with three other Pennsylvania State Police, all dressed in civilian clothes, wearing flack vests and armed, approached the apartment door of the defendant. When Trooper Solt reached the door, he knocked on it and requested the defendant to come out. He knocked a second time, heard movement in the apartment and soon saw the defendant appear at the door.

At that time Trooper Solt identified himself to the defendant and explained he was there to see if Evelyn Fisher was in the apartment. The defendant told him to come in and check, which Trooper Solt did. Prior to doing this, however, he asked the defendant to accompany the other three officers. Trooper Solt made this request for his own safety since his information at that time was that defendant had a loaded weapon in his possession. Trooper Solt then walked through the apartment and saw neither Evelyn Fisher nor a weapon. He then left the apartment and went down to the police cruisers, where Zimmerman was standing along with the other state policemen who by this time had removed their flack vests and placed their shotguns back in the vehicles. At this time he obtained general information from the defendant, such as his address and place of employment so that he

could complete his report, the purpose of which was simply to negate the presence of Evelyn Fisher in the apartment. After giving this information, the defendant spontaneously began talking about the events of July 31st. Also at about 1:12 a.m. the defendant gave Trooper Solt permission to look in his car. After that the defendant suggested that the police check the house he had been renting at 115 Ranck Avenue, New Holland, Pennsylvania, which was located near the residence of Evelyn Fisher and where, according to the defendant, Evelyn Fisher had been sometime during the afternoon of July 31, 1980.

Upon arriving at the premises at 115 Ranck Avenue, the police gained admission to the house, to which all the doors were locked, when the defendant removed a window to allow entrance. A search of that house as well as the garage to the rear of the house did not disclose the presence of Evelyn Fisher and the police and the defendant returned to Leola, where Trooper Solt apprised other police officers as to what had taken place to date.

Trooper Solt, before leaving Leola, gave his card to Deborah Kieffer and offered his assistance if there were any further problems. He then returned to the Pennsylvania State Police barracks to return equipment and then began heading for home. En route, he received a radio message to go back to Leola immediately because the defendant was threatening to commit suicide. Upon his arrival back at the defendant's apartment Trooper Solt conferred with the Kieffers and found out that a suicide note had been found at the apartment. At about 3:00 a.m., he again entered the apartment with defendant's permission. The defendant was lying face down on a bed and he asked Trooper Solt to come in to the bedroom and talk to him. Solt did this and at that time the defendant talked about his depression over his impending divorce and other family problems. The defendant also told Solt that he had held a gun to his head but did not have the courage to use it.

12

At about this time Trooper Solt suggested that the defendant needed mental treatment but the defendant said he had been at St. Joseph Hospital and did not like it there. Finally he agreed to go to the hospital and Trooper Solt contacted Crisis Intervention to start the commitment procedures. During much of this discussion of defendant's problems and the attempts to persuade him to go to St. Joseph Hospital, Eugene Kieffer, the defendant's brother-in-law, was with Trooper Solt and the defendant.

By 6:00 a.m. on August 1, 1980, the defendant had been taken to St. Joseph Hospital. Also there with him besides Trooper Solt were Deborah and Eugene Kieffer as well as a representative of Crisis Intervention, who conducted a preliminary interview. Trooper Solt stayed at the St. Joseph Hospital during the admission procedures because the defendant had requested him to do so and because it was not certain at that time if there was a bed available for the defendant. In addition, Solt had been requested by hospital authorities to act as the petitioner to have the defendant committed to the hospital. During this time at the St. Joseph Hospital the defendant had requested Trooper Solt's assistance in attempting to "put his day together" by going over the events of July 31, 1980. Sometime near the end of his stay at the hospital that morning, Trooper Solt was told by Eugene Kieffer that the defendant had asked him to get rid of fingernail clippings. Solt then had returned to the defendant and asked to take fingernail scrapings. The defendant was offended by this and said his nails were cut because the hospital regulations do not permit fingernail clippers and that he had known this from prior stays at the hospital.

Trooper Solt ultimately left the hospital around 8:50 a.m. on the morning of August 1, 1980 and because of the conversations concerning the fingernail clippings he asked the Kieffers to return with him to the Pennsylvania State Police barracks.

As a result of his conversation with the Kieffers at the barracks, he learned several things which the defendant had told the Kieffers either before Trooper Solt had arrived for the first time on July 31, 1980 or before he had arrived after being called back to defendant's apartment on August 1, 1980.

Several times after August 1, 1980, the Kieffers called the Pennsylvania State Police regarding things the defendant had told them. No one requested that the Kieffers report information to the Pennsylvania State Police or even suggested that they do so.

During all the time that Trooper Solt was involved with the defendant on July 31, 1980 and August 1, 1980, there was no evidence that a crime had been committed involving Evelyn Fisher. All that was known was that she was missing from her home as of July 31, 1980 and that defendant was a person who had seen her sometime on that day.

Although Deborah Kieffer periodically gave information to the police concerning statements the defendant made to her, she was never asked to work for the police or to obtain information at their request.

Finally, all of the conversations which defendant had with Trooper Solt were given by him in the absence of Miranda warnings. Thus there is no question that among other things the defendant was never told that the statements he was making to Trooper Solt could be used against him.

During the evening of July 31st and August 1st, defendant's person was never searched by the police nor was his freedom ever restrained in any physical manner by the police. From their standpoint, he was never in their custody much less under arrest.

The lower court concluded that appellant was "a rational human being who had acted voluntarily in talking to Trooper Solt at various occasions on July 31st and August 1st." The court also found that *Miranda* warnings were not

necessary under the circumstances of that initial questioning.

In reviewing the order of the suppression court, we must consider the evidence of the Commonwealth and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Silo*, 480 Pa. 15, 18, 389 A.2d 62, 63 (1978). "Where the suppression court's findings are amply supported by the record they may not be disturbed on appeal." *Commonwealth v. O'Bryant*, 479 Pa. 534, 537, 388 A.2d 1059, 1061 (1978). We find sufficient support in the record for the lower court's findings of facts.

■ On the basis of these facts, we agree that appellant's statements were at all relevant times voluntary. We note that appellant evinced no physical disability during his conversations with Trooper Solt. Even taking into account appellant's acute depression and considering his history of mental problems, we find nothing in the record to indicate that appellant's statements were the product of an irrational intellect. The testimony on record indicates that appellant at the time of questioning directed the police to 115 Ranck Avenue where he helped them gain admission to his former residence. Appellant discussed his problems concerning marriage and family. Sometime during those hours, he assessed the need to cut his fingernails for whatever reason and to attempt to dispose of the clippings. These factors in the totality of the circumstances point to a finding of voluntariness.

■ With respect to appellant's claim of *Miranda* violations, it is true that a person must be informed of his Fifth Amendment rights before any custodial interrogation can take place. Pennsylvania case law has defined "custodial interrogation" as questioning which occurs while the suspect is physically deprived of his freedom in any significant way or where he is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. *Commonwealth v. Chacko*, 500 Pa. 571, 577, 459 A.2d 311, 314 (1983). The

lower court found as a fact that appellant had never been physically deprived of his freedom. Together, the fact that appellant was never subjected to a search of his person, that he volunteered statements to Trooper Solt, that family members were present during much of the questioning, all counter a finding that appellant could reasonably have believed he was in custody at the time of the questioning. *See Commonwealth v. Hanna,* 267 Pa.Super. 15, 405 A.2d 1280 (1979) (suppression not required where nature of proceedings was investigatory, defendant was cooperative and investigation had not yet centered on defendant to the exclusion of others).

## II

Appellant next contends that the trial court erred by admitting into evidence testimony and exhibits which tended to establish a sexual motive for the attack. He argues that the evidence was relevant only to "other, uncharged crimes." Admission of the evidence in his trial for murder, appellant alleges, inflamed the passions of the jurors and unduly prejudiced his case.

The challenged evidence went to the position and condition in which the victim's body was found. Police discovered her body naked. A pair of jeans had been looped through the girl's arm bones. The arm bones were tied behind the girl's back. A knee sock was found stuffed in the girl's mouth. The clothing found in a pile approximately 125–130 feet away had apparently been cut from the girl's body:

The bra was a Best Form label, size 34A. The bra was cut in three different places. It was cut up the center between the two bra cups, it was cut on one shoulder strap and the back strap was also cut, but the clasps to the bra were still fastened.

I next found under the bra and yellow and white terry cloth pullover shirt. The shirt was cut up the center and cut up each side and up through and including the sleeve area. Under the shirt was a pair of cotton cloth panties,

a J.C. Penneys label, size 14. These panties were cut up· each side of the leg of the brief.

Testimony of John Ator. A pair of sneakers lay laced and tied atop the pile of clothing. The clothing and the sneakers were identified as those of Evelyn Fisher.

Commonwealth introduced these articles in an attempt to establish a sexual motive for the attack upon Evelyn Fisher. The prosecution posited that a sexual assault or molestation occurred contemporaneously with the killing. Under Commonwealth's theory of the case, the homicide grew out of the circumstances of sexually related criminal activity. We note that Commonwealth failed to charge appellant with a sexual offense. The crime of felony-murder was not before the jury.[3] We must reject any argument of relevance under a theory of felony-murder. It remains to be decided whether the evidence of sexual assault is relevant and admissible under some theory of criminal homicide.

Murder of the first degree requires proof that the killing was "willfull, deliberate and premeditated." 18 Pa.C.S. Sec. 2502(a) and (d). Cut clothing and a nude body do not in themselves establish a specific intent to kill. To the extent that the evidence was arguably relevant to establish the sequence of events, that relevance must be weighed against the potential for prejudice which would follow admission of the evidence. *Commonwealth v. Wright*, 259 Pa.Super. 293, 393 A.2d 833 (1978).

■ Murder of the third degree, however, consists of just two elements, causation and malice. *See* Jury Charge *infra* at footnote 5. Evidence which would tend to establish that appellant had pinioned the girl, gagged her, stripped her, struck her and left her to choke on her own blood would be relevant to the question of malice. *See Commonwealth v. Lawrence*, 428 Pa. 188, 236 A.2d 768 (1968) (blow to victim's head with hardwood stick followed by dragging of victim

---

3. Section 2502 of the Crimes Code defines murder of the second degree as "criminal homicide ... committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S. Sec. 2502(b).

for 80 feet and abandonment of him unconscious, half-naked on a winter night when victim was breathing but bleeding profusely HELD sufficient to establish malice). The evidence relevant and admissible to establish malice, the jury should have been instructed that the evidence was before it for that limited purpose, as tending to show malice.[4] *See* Pennsylvania Suggested Standard Jury Instructions, Criminal No. 3.08, Evidence of Other Offenses, Relevancy Limited to Particular Issue. The subcommittee Note to Instruction 3.08 suggests that the instruction "be given *whether or not requested* when the court has received evidence of an uncharged offense by the defendant which tends to prove a particular contention advanced by the Commonwealth or to rebut a defense contention." (emphasis added). Trial counsel failed to request a limiting instruction as to the relevance of the challenged testimony. Appellant has failed to raise a question as to counsel's inaction. The issue, therefore, is waived. *Commonwealth v. Quartman*, 253 Pa.Super. 460, 464, 385 A.2d 429, 432 (1978).

▉ As a corollary, appellant argues that the trial judge erred in allowing photographs of the victim's clothing at the scene to accompany the jury in its deliberations. Admission of photographs in a criminal case lies within the sound discretion of the trial court. Absent a flagrant abuse of that discretion, we will not disturb the decision of the lower court. *Commonwealth v. Woodward*, 483 Pa. 1, 394 A.2d 508 (1978).

---

**4.** The evidence would, of course, also tend to establish a sexual motive for the attack. Proof of motive is not required for a conviction of murder of the first degree. *See* 42 Pa.C.S. Sec. 2502(a). Motive may, however, be probative of intent to kill if the evidence establishes a motive to kill. *See Commonwealth v. Tomoney*, 488 Pa. 324, 412 A.2d 531 (1980) (testimony indicated that accused had a desire to retaliate for an earlier killing); *Commonwealth v. Robinson*, 468 Pa. 575, 364 A.2d 665 (1976) (jury could reasonably have inferred that defendant had intended to vent his malice toward his estranged wife and her employer). In contrast, the evidence in this case would tend to establish a motive for a sexual attack. Under a theory of felony-murder, that motive would be relevant to the question of transferred intent. The Commonwealth, we note, has failed to charge appellant with any felony. On the facts of this case, proof of motive is of dubious relevance to a specific intent to kill.

In determining whether to admit photographs of a crime scene, "the trial court must apply a balancing test as to the value of the evidence offered against its tendency to unduly inflame the jury's considerations." *Commonwealth v. Allen*, 239 Pa.Super. 83, 92, 361 A.2d 393, 397 (1976). The court determined that the evidence should be viewed by the jury. We note that the court permitted only the photographs of the sock and other articles of clothing to accompany the jury in deliberations. It did not allow the actual articles of clothing to go to the jury. It is well-established that the potential for prejudice is diminished where the photographs depict the crime scene rather than the body of the victim. *See Commonwealth v. Miller*, 268 Pa.Super. 123, 407 A.2d 860 (1979). We find no error in the lower court's choice.[5]

## III

Appellant raises a single challenge to the jury charge. He argues that the trial court erred in failing to correct its instruction on the doctrine of diminished capacity. Specifically, he alleges that the trial judge failed to explain the role and purpose of expert psychiatric testimony concerning appellant's mental capacity to form the specific intent required for a conviction of first-degree murder. *See Commonwealth v. Walzack*, 468 Pa. 210, 360 A.2d 914 (1976). He contends further that the trial judge neglected to inform the jurors that proof of diminished capacity could reduce the crime to murder of the third degree.

■ Our inquiry proceeds in stages. First we must decide whether a defendant in any event would be entitled to a charge on diminished capacity. Next, we determine whether the evidence in this case warranted such a charge. Finally, we assess the adequacy of the charge as given. "An accused offering evidence under the theory of diminish-

5. We note that counsel failed to request cautionary instructions. *Compare Commonwealth v. Allen*, 239 Pa.Super. at 92, 361 A.2d at 397 ("Also, the record shows that the lower court properly cautioned the jury to avoid prejudice against the defendants because of these exhibits.")

ed capacity concedes general criminal liability. The thrust of this doctrine is to challenge the capacity of the actor to possess a particular state of mind required by the legislature for the commission of a certain degree of the crime charged." *Commonwealth v. Walzack,* 468 Pa. at 221, 360 A.2d at 919–920. Appellant was charged, and the Commonwealth sought conviction, under a theory of murder of the first degree. Section 2502 of the Crimes Code defines murder of the first degree as "criminal homicide ... committed by an intentional killing." 18 Pa.C.S. Sec. 2502(a). The Commonwealth, in the instant case, had the burden of proving beyond a reasonable doubt that appellant possessed the specific intent to kill. *Commonwealth v. Walzack,* 468 Pa. at 218–19, 360 A.2d at 918. Evidence of appellant's diminished capacity was submitted for consideration of the jury. If believed, it could have negated the intent to kill necessary for a conviction of murder in the first degree. Appellant was entitled to a charge to that effect. *See Commonwealth v. Capitolo,* 324 Pa.Super. 61, 471 A.2d 462 (1984) (an accused has a fundamental right to submit to the jury whatever defenses are legally available to him); *cf. Commonwealth v. Rose,* 463 Pa. 264, 344 A.2d 824 (1975) (defendant is entitled to instruction that evidence of substantial intoxication, if believed, may negate element of intent to kill necessary for conviction of murder in first degree).

■ By stipulation of counsel, the trial court read into the record the reports of three doctors who had treated appellant. Dr. Truman E. Mast, the principal attending psychiatrist during appellant's first and second hospitalizations at St. Joseph Hospital, wrote in a report dated September 24, 1980 that appellant was rambling, confused and subject to auditory hallucinations. Dr. Mast diagnosed appellant's condition as major depression with psychotic features, paranoid personality disorder with history of some psychotic symptoms. On September 16, 1980, Dr. Lawrence Dresdale, a psychologist at St. Joseph's, filed a report regarding psychodiagnostic testing administered to appellant. Dr.

Dresdale's report noted severe signs of thought disorder in appellant's speech:

Gerald Zimmerman is currently functioning in the average range of intelligence with some loss of intellectual efficiency. By his report, he has had relatively long standing personality maladjustment associated with anxiety in social situations and paranoid ideation of a loosely structured nature. Drug and alcohol use apparently have contributed to his emotional disturbance. Personality testing reveals a though disordered individual with a rather considerable depressive component. The possibility exists that under emotional stress he could also experience disassociative reactions.

In a report dated October 7, 1980, Dr. Moscoso of the Harrisburg State Hospital diagnosed appellant's condition as depressive neurosis with paranoid features.

The defense then introduced Ann Woodland, a psychologist, who testified to the results of her psychological testing of appellant. She found a paranoid personality disorder as well as substance organic mental disorder resulting from appellant's drug and alcohol involvement. Woodland had questioned appellant about his involvement with the victim:

He told me that he had used Evelyn as a babysitter, that he knew her well, the family knew each other, and when Jerry spoke about the events that happened, there was lapses in his memory and confusion. He could not sequence the events from the day before to the day of the alleged crime. He did mention to me that he struck her. He recalls doing that. From then on, Jerry couldn't remember what happened.

Dr. Robert J. Kurey, qualified as an expert witness in psychiatry, gave his opinion that appellant "at the moment I feel of the alleged crime had a diminished capacity."

On the testimony presented, we conclude that the issue of diminished capacity had been fairly raised. The duty fell therefore to the trial judge to instruct the jury fully and accurately as the applicable legal principles. *Cf. Commonwealth v. Demmit,* 456 Pa. 475, 483, 321 A.2d 627,

632 (1974) ("There must be some evidence in the case from whatever source....").

The lower court charged the jury that:

> There was testimony by the defendant's—the witness called by the defendant, the psychiatrist, as to the diminished capacity. Murder in the first degree, as you well know by now, is an intentional killing. It is willful, deliberate and premeditated. The killer must make a conscious decision to kill and must have a fully formed intent to kill. In determining whether or not the defendant committed the kind of intentional killing required for first degree murder, you should consider the evidence of the expert witnesses as well as all other evidence which may shed light on what was going on in the defendant's mind at the time of the alleged killing.

The charge as given was deficient in several respects. It failed to either define diminished capacity or explain its relevance. More importantly, the charge failed to apprise the jury that a finding of diminished capacity would reduce the crime to murder of the third degree.[6]

Our Supreme Court, in *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 36, 454 A.2d 937, 947 (1982), cert. denied, *Zettlemoyer v. Pennsylvania*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), approved a charge defining the defense of diminished capacity as "a contention that because of the

---

6. The lower court defined third degree murder as consisting of two elements:

> The first element, again, the same as in first degree murder, is you must find the death of Evelyn Fisher would not have occurred but for the defendant's act.

> The second element of murder of the third degree is that the defendant acted with malice, and malice has a meaning in law which is as follows:

> Malice consists either of an intent to kill or inflict great bodily harm or of a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty indicating unjustified disregard for the probability of death or great bodily harm and an extreme indifference to the value of human life. Malice may be either expressed by the defendant or implied from his words or contact.

We note that appellant has failed to challenge the sufficiency of the evidence to sustain his conviction for murder of the first degree.

mental capacity of the defendant he did not have the ability to form a specific intent to kill at the time he committed the crime." *Accord Commonwealth v. Weinstein*, 499 Pa. 106, 112–13, 451 A.2d 1344, 1347 (1982), citing *Commonwealth v. Walzack*, 468 Pa. 210, 360 A.2d 914 (1976) (psychiatric testimony relevant to the cognitive functions of deliberation and premeditation is competent on the issue of specific intent to kill). The charge approved in *Zettlemoyer* made clear:

> The burden of proof rests with the Commonwealth to prove such element of the crime beyond a doubt. Therefore, in order to meet the burden of proof required for murder of the first degree, the Commonwealth must prove beyond a reasonable doubt that the killing was willful, deliberate and premeditated and that at the time of the killing the defendant was not acting with a diminished capacity.
>
> \*      \*      \*      \*      \*      \*
>
> The mere fact that the Commonwealth produced evidence tending to show that the defendant may have had a motive to kill or that he planned and premeditated the killing does not necessarily eliminate the defense of diminished capacity. If you have a reasonable doubt that during that time period in which the defendant planned and premeditated that he suffered a mental illness, defect or abnormality which prevented him from fully forming the specific intent required for murder of the first degree then you must find him not guilty of first degree murder.

500 Pa. at 37, 454 A.2d at 947. The charge in the instant case mentions, but does no more than mention, the partial defense of diminished capacity. In light of the gravity of the offense, the "narrow" nature of the diminished capacity defense, *Commonwealth v. Zettlemoyer*, 500 Pa. at 39–40, 454 A.2d at 949, and the fact that Commonwealth relied entirely on circumstantial evidence to establish intent, something more was needed.

At the very least, the trial court should have defined the concept of diminished capacity, explained the relevance of

diminished capacity to the requisite intent to kill and instructed the jury that proof of diminished capacity could reduce the crime to murder of the third degree. *Cf.* Pennsylvania Suggested Standard Jury Instructions, Criminal No. 5.01B:

> 5.01B (Crim) DIMINISHED CAPACITY—RELEVANCE OF EXPERT TESTIMONY TO SPECIFIC MENS REA
>
> (1) As I told you earlier, you cannot find the defendant guilty of first degree murder unless you are satisfied beyond a reasonable doubt that he had the specific intent to kill. A specific intent to kill is a fully formed intent to kill of which the defendant was conscious. The defendant asserts that as a result of an abnormal mental condition he was at the time of the killing incapable of that kind of intent. Obviously, you cannot find him guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the defendant's claim is wrong and that he was capable of the specific intent to kill.

Date of Last Revision, October 1983. Trial counsel did request the judge to instruct the jurors that: "evidence of diminished mental capacity, if believed by them, is sufficient to reduce the degree of the crime of murder. Not only might it be sufficient to reduce the degree, but (it) is evidence to be considered by them in order to determine whether to reduce the degree." The trial judge declined to do so.

█ While we believe that the better practice would have been to issue the requested charge, we note that the court did properly instruct the jury as to the elements of first and third degree murder. Reading the jury charge as a whole, we cannot say that the lower court's failure to instruct the jury on "diminished capacity" constitutes reversible error. *See Commonwealth v. Ohle*, 503 Pa. 566, 470 A.2d 61 (1983) (jury instruction must be read as a whole).

### IV

█ Appellant challenges the effectiveness of assistance rendered by trial counsel. At the time of trial, lead counsel

for the defense was a candidate for judge of the Court of Common Pleas of Lancaster County. Counsel had received the endorsement of the Republican party; he ran unopposed in the primary election which took place several days after the close of appellant's trial. This case had generated a tremendous amount of publicity adverse to appellant; for that reason, a change of venue had been granted. Appellant argues that the conflict created by counsel's candidacy and concommitant need to maintain a favorable public image effectively precluded presentation of an unimpaired defense.

The Code of Professional Responsibility provides that: "Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or personal interests." Code of Professional Responsibility DR 5–101(A) (adopted by the Supreme Court of Pennsylvania on February 27, 1974). The Code explains: "The desires of a third person will seldom adversely affect a lawyer unless that person is in a position to exert strong economical, political, or social pressures upon the lawyer. These influences are often subtle, and a lawyer must be alert to their existence." Code of Professional Responsibility EC 5–21.

To show ineffective assistance of counsel, appellant must establish that counsel's outside interests impinged on his representation of appellant at trial. "Counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had some reasonable basis designed to effectuate his client's interests." *Commonwealth v. Dancer*, 460 Pa. 95, 103, 331 A.2d 435, 439 (1975).

Appellant, in support of his claim of ineffectiveness, objects to various statements made by counsel during closing argument. Counsel began his argument by cautioning the jury not to confuse the lawyer with his client:

Lawyers often get asked well, why are you involved in that case. How can you be involved in that case. I hope that this quotation provides the answer.

'From the moment that any advocate can be permitted to say that he will or will not stand between the crown and the subject charged in the Court where he daily sits to practice, where the advocate or the lawyer can make that decision, the liberties of England are at an end. If the lawyer refuses to defend from what he may think of the charge or of the defense, he assumes the character of the Judge. Nay, he assumes it before the hour of judgment and in proportion to his rank and reputation, puts the heavy influence of perhaps a mistaken opinion into the scale against the accused.'

He characterized the case as a "very hot potato," "a gruesome case," and "not a pleasant duty." He instructed the jury that malice is an ingredient in murder of the first degree. He told the jurors: "You know I can look each of you right in the eye and I can say to you that I don't think it's a verdict of not guilty."

At a post-trial evidentiary hearing, counsel explained he had wanted the jury to understand that he knew the case was a very serious one. The characterizations, a "very hot potato," "a gruesome case" and "not a pleasant duty" can be deemed fairly calculated to impress upon the jury the seriousness of the task before it. Counsel's statement regarding malice, though potentially misleading, *see* Pennsylvania Suggested Standard Jury Instructions, Criminal No. 15.2502A, must be weighed against his repeated cautions that the judge would ultimately instruct the jury on the law. The judge did subsequently charge the jury on the constituent elements of the various types of criminal homicide. We find no reversible error here.

Again, counsel's assertion that his client was guilty of some type of criminal homicide may be interpreted as a tactical choice designed to establish credibility with the jury. *Cf.* Code of Professional Responsibility DR 7–106(c)(4) ("In appearing in his professional capacity before a

tribunal, a lawyer shall not ... (a)ssert his personal opinion ... as to the guilt or innocence of an accused....").

We are troubled still by the quote with which counsel commenced his close to the jury. The quote, which counsel later explained came from Thomas Erstine's defense of Thomas Paine, served only to tell the jury why he, counsel, was involved with this "gruesome case." It is impossible to assess the impact of this statement. A reasonably foreseeable effect would have been to isolate the defendant still further and to strip from him whatever credibility he may have derived from association with counsel. We note the mandate of Disciplinary Rule 7–101: "A lawyer shall not intentionally ... (p)rejudice or damage his client during the course of the professional relationship...." Code of Professional Responsibility DR 7–101(A)(3). We are sensitive to problems facing an attorney charged with the defense of an unpopular case. Once the attorney undertakes representation of that client, however, he must subsume his personal feelings of dismay to the best interests of his client. *See* ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, The Defense Function, Standard 1.6, Client interests paramount ("whether privately engaged, judicially appointed or serving as part of a legal aid system, the duties of a lawyer to his client are to represent his legitimate interests, and considerations of personal and professional advantage should not influence his advice or performance"). On the facts of this case, we do not find reversible error in counsel's inopportune statements during close.

■ Appellant also alleges ineffective assistance for counsel's failure to object to various statements made by the district attorney during closing argument. The gist of these statements was to characterize the offense as a sex crime:

And it is clearly, it should come as no surprise to anyone, the contention of the Commonwealth that there was a sexual motivation, although it is an uncharged crime, and sexual advances on his part.

\* \* \* \* \* \*

He drove back further on the firetrail, and at a location farther back the trial, removed her from the car, cut off her clothing in an effort to have his way with her.

\* \* \* \* \* \*

A sexual assault.

Although appellant had not been charged with a sexually-related crime, Commonwealth had been permitted to introduce evidence tending to suggest that appellant's motive was sexual in nature. Once the evidence was admitted, the district attorney could fairly argue the facts and evidence and legitimate inferences therefrom. *Commonwealth v. DeMarco*, 281 Pa.Super. 62, 67–68, 421 A.2d 1147, 1150 (1980). Further, as defense counsel explained at the post-trial evidentiary hearing, strategy dictated that he not bring "attention to that particular statement, sexual advances. We didn't want to draw any more attention to it by the jury." Finding a reasonable basis for counsel's inaction, we reject appellant's claim. *Commonwealth v. Dancer*, 460 Pa. at 104, 331 A.2d at 439.

Judgment of sentence affirmed.

CAVANAUGH and HOFFMAN, JJ., concur in result.